OPINION OF THE COURT
Joseph Harris, J.
This case might well be denominated Boreali Revisited. In Boreali v Axelrod (71 NY2d 1 [1987]), the Court of Appeals ruled that the Public Health Council, an administrative agency adjunct to the Commissioner of Health, had overstepped the boundaries of its lawfully delegated authority (Public Health Law § 225 [5] [a]), when, with the approval of the Commissioner of Health, it promulgated a comprehensive code to govern tobacco smoking in indoor areas open to the public (10 NYCRR part 25). The regulations sought to strike a proper balance among health concerns, cost and privacy interests, which the court held to be a uniquely legislative function and an expression of public policy that had not by Public Health Law § 225 (5) (a), nor by any other legislation, been delegated to the Public Health Council — that such an expression of public policy must either be addressed directly by the Legislature or at least by enabling legislation which delegates such authority with clearly delineated standards. (Boreali v Axelrod, supra, at 12, 14-16.) By chapter 244 of the Laws of 1989, enacted July 5, 1989, amending the Public Health Law by adding a new article 13-E entitled "Regulation Of Smoking In Certain Public Areas”,[1] the State Legislature adopted the former approach and itself established a comprehensive plan regulating tobacco smoking in public areas substantially similar to the regulations previously promulgated by the Public Health Council. In this proceeding petitioners seek to declare *290 chapter 244 of the Laws of 1989 unconstitutional, and to enjoin enforcement of the law.
The gravamen of chapter 244 is the attempt to protect the people of the State of New York from the perceived deleterious effects of environmental tobacco smoke, more commonly known as secondhand tobacco smoke,[2] by minimizing the exposure of nonsmokers thereto.
Chapter 244, § 1 declares: "The legislature finds that there is a substantial body of scientific research showing that breathing secondhand smoke is a significant health hazard for nonsmokers. The legislature further finds that it is in the best interests of the people of this state to protect nonsmokers from involuntary exposure to secondhand tobacco smoke in indoor areas open to the public, food service establishments, and places of employment. The legislature recognizes, however, that a balance must be struck between safeguarding citizens from such involuntary exposure to secondhand tobacco smoke and the need to minimize governmental intrusion into the affairs of its citizens. Therefore, the legislature declares that the purpose of this act is to preserve and improve the health, comfort and environment of the people of this state by limiting exposure to tobacco smoke.”
Chapter 244 repealed the provisions of Public Health Law § 1399-0, which had been enacted in 1975, and which prohibited the smoking of tobacco in public means of mass transportation, libraries, museums and theatres, and enacted a new article 13-E of the Public Health Law. New article 13-E of the Public Health Law prohibits smoking in indoor areas open to the public in auditoriums, elevators, gymnasiums, enclosed areas containing a swimming pool, food stores, classrooms, public means of mass transportation and ticketing and boarding areas in public transportation terminals. (Public Health Law § 1399-0 [1].) Additionally, smoking is prohibited in indoor areas open to the public in schools, hospitals, public buildings, commercial establishments, indoor arenas, waiting rooms and waiting areas, banks, rest rooms, waiting areas in public transportation terminals and service areas in cafeterias and businesses selling food for on- and off-premises consumption. (Public Health Law § 1399-0 [2].) The owner of areas specified in Public Health Law § 1399-0 (2) may designate smoking areas, defined in Public Health Law § 1399-n (11), as an *291 enclosed area in which smoking is permitted, within the enumerated areas. (Public Health Law § 1399-0 [3].)
Public Health Law § 1399-0 (4) and (5) deal with the obligations of operators of bowling establishments, bingo halls and food service establishments to provide smoke-free areas. In the cases of bingo halls and food service establishments, such areas must meet patron demand, subject to provisions which specify when it will be presumed demand is met. Bowling establishments are subject to certain prohibitions and restrictions.
Public Health Law § 1399-0 (6) provides that employers, as defined in Public Health Law article 13-E, must put into effect a written smoking policy. Such policies at a minimum must provide nonsmokers with a smoke-free work area. Smoking may be permitted if all employees assigned to a work area agree. An employer must use its best efforts to comply with an employee’s request for a smoke-free work area, and, if an accommodation cannot be reached, the employer must designate the employee’s work area as a smoke-free work area. Smoking in workplaces is also prohibited in auditoriums, gymnasiums, classrooms, elevators, hallways, rest rooms, employee medical facilities, rooms or areas containing employee medical facilities, and rooms or areas containing photocopying or other equipment used in common. Contiguous nonsmoking areas are required in cafeterias and lounges sufficient to meet employee demand.
The provisions of Public Health Law article 13-E expressly do not apply to private homes, residences and automobiles, private social functions, conventions and trade shows where the organizer provides required notice to the effect that smoking will not be restricted, hotel and motel rooms, tobacco businesses, limousines under private hire, wholly or partially enclosed private boxes in indoor arenas, and bars. (Public Health Law § 1399-q.)
Enforcement responsibility is placed with the New York City Board of Health, county boards of health, or, in a county without such a board, with an officer designated by the county legislature or board of supervisors. If a county without a board of health chooses not to designate an enforcement officer, the Commissioner of Health is responsible for enforcement until such county does designate an enforcement officer. Enforcement decisions, made after a hearing, may be appealed to the Commissioner of Health or may be reviewed in a CPLR article *292 78 proceeding. (Public Health Law § 1399-t.) Fines may be levied, ranging from $500 to $1,000. (Public Health Law § 1399-v.)
The statute authorizes issuance of waivers for specific provisions based upon financial hardship or factors which would render strict compliance unreasonable. Waivers are available to factories and warehouses that demonstrate that the effect of smoking on employees has been reduced to a minimal degree.
The effective date for all restrictions is January 1, 1990, save for those provisions concerning the workplace, which take effect April 1, 1990.
STANDING
To attack the constitutionality of a legislative enactment, a petitioner must demonstrate that he has suffered, or is about to suffer, some actual or threatened injury to a protected interest (Matter of Daniel C., 99 AD2d 35 [2d Dept 1984], affd 63 NY2d 927; Cherry v Koch, 126 AD2d 346 [2d Dept 1987]).
Petitioners set forth that they are both citizens and taxpayers of the State of New York, residing in Albany County, who, as regular users of tobacco products in public and private places, both indoors and out-of-doors, are prejudiced and adversely affected by the statute and the implementation thereof. Petitioner Blau asserts further that he is an indoor office employee and is further prejudiced by those provisions of the statute governing work sites. Both petitioners additionally assert that the statute further "oppresses” and "discriminates against” them by virtue of certain enumerated provisions set forth in the petition.
Whether, in a sense, the petitioners in fact have substantively suffered, or are about to suffer, some actual or threatened injury to a protected interest, is subject to debate. Be that as it may, they have demonstrated sufficient standing to challenge the constitutionality of the statute.
PROCEDURAL REMEDY
Initially this proceeding was brought pursuant to CPLR article 78. It is clear that an article 78 proceeding may not be utilized to test the constitutionality of a legislative enactment, as distinct from the constitutionality of its application. This is *293 the province of an action for a declaratory judgment. (Board of Educ. v Gootnick, 49 NY2d 683, 687 [1980].) Nevertheless, the Court of Appeals has held that when all necessary parties are before the court, a proceeding brought as an article 78 proceeding may be converted by the court to a declaratory judgment action. (See, Matter of Gold v Lomenzo, 29 NY2d 468; Matter of Montgomery Ward & Co. v New York State Dept. of Motor Vehicles, 90 AD2d 643 [3d Dept 1982].) Accordingly, this court opts to convert this proceeding to an action for a declaratory judgment, and the respondents having upon such anticipated conversion moved for summary judgment, and there being only legal issues to address, and no factual issues, the court will proceed to render its determination upon said motions. (See, Brennan v Regan, 145 Misc 2d 889 [Sup Ct, Albany County 1989].)
THE LAW
The issues involved here were necessarily not dealt with in Boreali (supra), except for dictum, and for the suggestion that the policy objective of minimizing nonsmokers’ exposure and balancing same against economic and social considerations would be best addressed by direct legislation rather than relying on the amorphous and general delegations contained in the enabling statute that created the Public Health Council (Public Health Law § 225 [5] [a]). The sole issue in Boreali (supra) was the sufficiency of the legislative delegations upon which the Public Health Council, an administrative agency, based its authority to promulgate its now-stricken regulations, not the authority of the Legislature itself to enact that which the Public Health Council sought to accomplish by administrative regulation. The authority of a Legislature to enact a particular law — and the validity of the particular legislative enactment involved here — implicates a panoply of due process and equal protection considerations, the full gamut of which the petitioners raise.
Firstly, petitioners raise the familiar specter that it has yet to be proven that secondhand smoke (or environmental tobacco smoke) represents a significant health hazard to nonsmokers, citing to that effect the reports of several scientific conferences held between 1983 and 1986.
The weight of scientific evidence, however, is overwhelmingly to the contrary, as acknowledged by the Court of Appeals, by way of dicta, in Boreali (supra, at 6, 8).
*294 In December 1986, the Surgeon General of the United States issued a comprehensive report entitled The Health Consequences of Involuntary Smoking, a report of the Surgeon General (hereinafter referred to as the Surgeon General’s report), which reviewed all available scientific evidence pertaining to the health effects of environmental tobacco smoke on nonsmokers. The report concluded that:
"1. Involuntary smoking is a cause of disease, including lung cancer in healthy nonsmokers.
”2. The children of parents who smoke compared with the children of non-smoking parents have an increased frequency of respiratory infections, increased respiratory symptoms, and slightly smaller rates of increase in lung function as the lung matures.
"3. The simple separation of smokers and nonsmokers within the same air space may reduce, but does not eliminate, the exposure of nonsmokers to environmental tobacco smoke.” The conclusions reached by the Surgeon General concerning the health effects of environmental tobacco smoke are consistent with previous reports issued by the United States Public Health Service and the chemical analyses performed on environmental tobacco smoke. As stated by the Surgeon General in his forward to the 1986 report, "data have conclusively established cigarette smoking as the largest single preventable cause of premature death and disability in the United States.”[3]
*295 In the light of this overwhelming scientific evidence, it is reasonable to conclude that chapter 244 of the Laws of 1989 is an appropriate response by the Legislature to the need to protect the citizens of the State of New York from involuntary exposure to environmental tobacco smoke. As of October 1989, 43 States and the District of Columbia have enacted restrictions against smoking in at least one public place. Twenty-six States have enacted comprehensive clean indoor air acts.[4]
In New York State, Nassau, Suffolk, Westchester, Orange, Monroe, Rockland, Ontario, Chautauqua and Putnam Counties, and New York City and Ithaca have enacted local smoking restrictions.
Even if the scientific evidence demonstrating the deleterious effect of environmental tobacco smoke were not so overwhelming as it is, it would not be the prerogative of this court to contest the wisdom of the Legislature in choosing what evidence to credit. That is a legislative prerogative. There is a presumption that the Legislature investigated and found facts necessary to support the legislation (I.L.F. Y Co. v Temporary State Hous. Rent Commn., 10 NY2d 263, 269; Wiggins v Town of Somers, 4 NY2d 215, 218). In order to invalidate a statute on the basis that the statute lacks support in fact, petitioners must show that the facts on which the Legislature relied are not only erroneous, but that the issue is not even "truly debatable” (New York State Club Assn. v City of New York, 487 US 1, 18 [1988]). Petitioners have not met and cannot meet this standard.
In Defiance Milk Prods. Co. v Du Mond (309 NY 537, 540-541 [1956]), the Court of Appeals stated: "Every legislative enactment carries a strong presumption of constitutionality including a rebuttable presumption of the existence of necessary factual support for its provisions (Borden’s Co. v. Baldwin, 293 U. S. 194, 209, 210). If any state of facts, known or to be assumed, justify the law, the court’s power of inquiry ends (United States v. Carolene Products Co., 304 U. S. 144, 154). Questions as to wisdom, need or appropriateness are for the Legislature (Olsen v. Nebraska, 313 U. S. 236, 246). Courts *296 strike down statutes only as a last resort (Matter of Ahern v. South Buffalo Ry. Co., 303 N. Y. 545, 555, affd. 344 U. S. 367) and only when unconstitutionality is shown beyond a reasonable doubt (Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 79; Matter of Fay, 291 N. Y. 198, 206, 207).” (See also, Pharmaceutical Mfrs. Assn. v Whalen, 54 NY2d 486; Rochester Gas & Elec. v Public Serv. Commn., 71 NY2d 313, 320; 41 Kew Gardens Rd. Assocs. v Tyburski, 70 NY2d 325, 333; Trump v Chu, 65 NY2d 20, 25; Maresca v Cuomo, 64 NY2d 242, 250-251.)
Petitioners allege a "right of liberty and privacy” to smoke, and contend that the statute establishes irrational classifications and in other diverse ways violates their right to due process and the equal protection of the laws.
Respecting their due process arguments, petitioners contend the statute: (1) impermissibly intrudes upon the right of a citizen to be "let alone” in the conduct of his private affairs; (2) is irrational and capricious in certain particulars, such as prohibiting smoking in all public areas regardless of physical lay-out and spatial considerations, and exempting restaurants with a seating capacity of 50 persons or less; (3) is impermissibly vague in certain of its definitions; (4) effects an unconstitutional delegation of police power by authorizing a private person who may be the owner or operator of an indoor area to entirely prohibit smoking therein, and by conferring upon State agencies and municipal corporations rule-making authority without sufficient guidelines; (5) is animated by a pernicious motive, namely, behavior modification; and (6) subjects petitioners to unreasonable sanctions.
Respecting their equal protection arguments, petitioners contend the statute: (1) creates and subordinates one class of citizen (smokers) to another (nonsmokers); (2) curtails access by the subordinate class (smokers) to places of public accommodation by reason of their personal habits; (3) forces the subordinate class to work in a smoke-free area at the request of a single, nonsmoking fellow employee; and (4) discriminates against members of the subordinate class on the basis of a physiological impairment (nicotine addiction).
Petitioners’ claims are without merit. Chapter 244 is a recognition by the New York Legislature of the medical harm inflicted upon nonsmokers by involuntary exposure to secondhand smoke in indoor areas open to the public, food service establishments and places of employment. It seeks to safe *297 guard the public from involuntary exposure to secondhand smoke, with this health consideration balanced against economic and social considerations. Where smoking may be permitted, and under what circumstances, along with what is a satisfactory provision of nonsmoking areas to protect the public, reflects a well-modulated, carefully considered, balancing of interests so as to best protect the public without unduly burdening private individuals or businesses. The scope of the statute is broad and comprehensive — as broad and comprehensive as the findings set forth in the legislative declaration — no more and no less.[5]
There can be no question that the regulation of smoking is a valid use of the State’s police power. There is no more a fundamental right to smoke cigarettes than there is to shoot up or snort heroin or cocaine (People v Broadie, 37 NY2d 100) or run a red light. Indeed, the United States Supreme Court, in Austin v Tennessee (179 US 343, 349 [1900]), stated that it was within the province of a State to say how far cigarettes may be sold, "or to prohibit their sale entirely” (see also, Posadas de Puerto Rico Assocs. v Tourism Co., 478 US 328, 346 [1986]).
Contrary to the assertion of petitioners, chapter 244 does not restrict their access to public places, only their right to smoke there. Chapter 244 pertains only to activity of a public dimension. It does not apply to significantly private areas, such as private homes, residences, automobiles, hotel or motel rooms, or to private events, such as private social functions where the seating arrangements are under the control of the sponsor of the function.
The use of considerations of spatial dimensions and proximity of smokers to nonsmokers in certain instances, and complete prohibition of smoking in others, represents an accommodation between the desire to limit the exposure of nonsmokers to tobacco smoke and relevant economic and social considerations. The Legislature, with authority to do so, accepted concerns that completely prohibiting smoking at such places as food service establishments, bingo halls and bowling alleys would have a substantial adverse impact on patronage there at. Thus reasonable compromises were resolved upon, *298 requiring the designation of nonsmoking areas to protect the health of those patrons not wishing to be exposed to tobacco smoke. Ventilation devices and air cleaners were further found by the Legislature not to be an effective substitute.[6] It was within their power to so find.
The other specific arguments of the petitioners fall before the police power of the State. The police power of a State is not only a right of the State, but a duty, to be exercised by its Legislature for the general good of all of the people of the State.
If petitioners in fact have a general "right of privacy” to smoke, this legislation merely requires them to exercise it outdoors or in private. There is no differentiation between classes of citizens by this law. Those who smoke have never in law been recognized as a distinct class. Under chapter 244 no person loses any recognizable right or liberty by virtue of being a smoker. It is not a blanket prohibition against smoking, merely a limitation of smoking in public areas where other persons will involuntarily be exposed to secondhand smoke.
All law to an extent is a deprivation of freedom of conduct and impacts differently on different persons. Such is permissible, provided there be a rational connection between the means employed and a legitimate governmental objective. Chapter 244 is no different from any other law by which conduct, permissible in private, is regulated in public for health reasons. (See, Montgomery v Daniels, 38 NY2d 41; People v Bunis, 9 NY2d 1; Wiggins v Town of Somers, 4 NY2d 215, supra; Defiance Milk Prods. Co. v Du Mond, 309 NY 537, supra; Rochester Gas & Elec. v Public Serv. Commn., 71 NY2d 313, supra; Maresca v Cuomo, 64 NY2d 242, supra.)
It is evident that "classification” into smokers and nonsmokers is rationally related to the legislative objective expressed in the legislative declaration inasmuch as there is no other possible manner of regulating the activity involved than to distinguish smokers from nonsmokers. And inasmuch as the challenged legislation does not create or apply to a *299 "suspect” class[7] or affect a "fundamental” right,[8] it is not subject to "strict [judicial] scrutiny”, but rather to the "rational basis” standard of review applicable to due process claims (see, Montgomery v Daniels, 38 NY2d 41, 61, supra [no-fault automobile liability]; Maresca v Cuomo, 64 NY2d 242, supra [constitutionality of mandatory requirement for retirement of Judges at age 70]). The Equal Protection Clause does not prevent State Legislatures from drawing lines that treat one class of individuals or entities differently from others, unless the difference in treatment is " 'palpably arbitrary’ ” or amounts to an " 'invidious discrimination’ ” (Trump v Chu, 65 NY2d 20, 25, supra; see also, Alevy v Downstate Med. Center, 39 NY2d 326).
Petitioners’ arguments respecting alleged irrationality and inefficacy of the legislative framework embodied both in the particulars and the entirety of the statute are ill-founded and reduce more to the wisdom of the legislation than to its rationality. It is crystal clear that the legislative scheme embodied in the statute, both in its particulars and its entirety, is rationally related to its stated objective of protecting nonsmokers from the health hazards of involuntary exposure to secondhand tobacco smoke in public indoor areas.
Once again, courts do not sit in review of the wisdom, propriety or expediency of the acts of a Legislature (Defiance Milk Prods. Co. v Du Mond, supra; People v Friedman, 302 NY 75). "The judicial function is exhausted with the discovery that the relation between means and end is not wholly vain and fanciful, an illusory pretense.” (Williams v Mayor, 289 US 36, 42.)
Striking a proper balance among health concerns, cost and privacy interests is a uniquely legislative function (Boreali v Axelrod, 71 NY2d 1, 12, supra). The means employed by the Legislature to accomplish its objective need only have some basis in reason. They do not have to be the best means, or even effective ones, nor must they address every facet of the problem, so long as they bear some logical relationship to the *300 legislative end. (See, Oriental Blvd. Co. v Heller, 27 NY2d 212, 219; Biddles, Inc. v Enright, 239 NY 354, 365.) Efforts at solution of serious problems will not wait on the perfection of knowledge or the application of optimal methods of alleviation to the exclusion of trial and error experimentation (Oriental Blvd. Co. v Heller, supra, at 219).
The fact that the means employed by the Legislature imposes inconvenience or hardship is a plea to be addressed to the ballot box or to the Legislature, not the courts (People v Friedman, supra).
Neither are the definitions utilized in the statute vague and uncertain, nor does the statute unconstitutionally delegate police power. Authorizing the owner or operator of an indoor area to entirely prohibit smoking in that area effects no change from the common-law right of an owner of private property to curtail smoking on his premises; nor does the statute confer substantive rule-making authority on any State agency or municipality. The Commissioner of Health is expressly precluded from promulgating substantive regulations (Public Health Law § 1399-x), and respecting the role of municipalities, no delegation of rule-making authority is conferred, only the specific expression of the Legislature that the statute was not intended to preempt local governments from acting in an area (public health) in which they have long been authorized to act (see, e.g., Public Health Law § 347).
 The penalties imposed for violations of the statute are neither unreasonable nor disproportionate to the offense; they are neither shocking nor bizarre. Indeed they are simply the same penalties long prescribed elsewhere in the Public Health Law (see, Public Health Law §§ 12-a, 309 [1] [f]). And respecting the argument of petitioners that the true purpose of the statute is behavior modification, it has been long settled that, in the enactment of a law, no motive, purpose or intent may be imputed to the Legislature other than such as are apparent upon the face of the law itself. (People ex rel. Sturgis v Fallon, 152 NY 1.)
CONCLUSION
The regulation of indoor smoking in public areas and workplaces, so as to minimize the deleterious effects of environmental tobacco smoke upon nonsmokers therein, is a proper subject for legislative action, and a legitimate State objective, since it concerns a subject (public health) traditionally reserved to the police power. In the enactment of chapter 244 of the Laws of 1989, the New York Legislature adopted means *301 rationally related to the accomplishment of that legitimate State objective.
The legislation deprives no one of a fundamental interest, nor does it discriminate along suspect lines — therefore, this court may not sit in review of its wisdom, propriety or efficacy. Having a basis in reason, the enactment is a valid exercise of the police power.
Thus has Boreali (supra) been revisited, and that which could not be accomplished by administrative rule has now legitimately been accomplished by legislative fiat. The motions by respondents for summary judgment are granted, chapter 244 of the Laws of 1989 is declared constitutional, and the petition is dismissed.

. Known colloquially as the "Clean Indoor Air Act.”

. That smoke which is either not inhaled by the smoker in the act of smoking or is thereafter exhaled by him.

. The concentration of cancer-causing agents in sidestream smoke (smoke emitted from the burning end of a cigarette, cigar or pipe) has been reported to exceed that contained in mainstream smoke (that inhaled through the mouthpiece end of the cigarette, cigar or pipe). (Friedman, Prevalence and Correlates of Passive Smoking, 73 Am J of Public Health, No. 4,1983.)
About 90% by weight of tobacco smoke is in the gas phase and toxic substances in the gas phase are not removed by standard air filtration systems. (Collishaw, Tobacco Smoke in the Workplace, An Occupational Health Hazard, 131 Canadian Med Assocs J [Nov, 15,1984].)
Exposure to indoor smoking frequently puts nonsmokers in conditions that exceed standards set by the Nation for outdoor air pollution. (Repace, The Problems of Passive Smoking, Bulletin of NY Academy of Medicine 936-946 [Dec. 1981].)
"[Tjhere is clear evidence that non-smokers who live with smokers have a 35% higher risk of getting lung cancer than those who do not live with smokers.” (Marshall, Involuntary Smokers Face Health Risks, Science Magazine [Dec. 1986]; see also, Cummings, Measurement of Current Exposure to Environmental Tobacco Smoke, Archives of Environmental Health [accepted *295 for publication]; Passive Smoking in the Workplace: Selected Issues [a report of the Off of Technology Assessment of the US Congress (May 1986)]; Report on the Impact of Smoking in New York State [a report of the Bureau of Communicable Disease Control, NYS Dept of Health].)

. See, State Legislated Actions on Tobacco Issues, an October 1989 report by Tobacco-Free America (a public policy project sponsored by Am Cancer Socy, Am Heart Assn, and Am Lung Assn).

. Significantly, Laws of 1989 (ch 244) is not the first legislative enactment in the State of New York to regulate tobacco smoking. It is an extension and expansion of Public Health Law former article 13-E, which it replaces. Thus, it is not as if chapter 244 struck the smokers of New York like a bolt out of the blue!

. Ventilation devices, where used, were found not to resolve the problem of exposure to secondhand smoke inasmuch as these devices often merely recirculated smoke, and research has shown that standard filtration devices do not remove smoke and toxins in the gas phase.

. E.g., race, national origin, and alienage. The character traits of suspect classifications appear to share a common element — "an immutable characteristic determined solely by the accident of birth” (Frontiero v Richardson, 411 US 677, 686).

. These, in the constitutional sense, include the right to vote, the right to travel, the right to procreate, certain rights of criminal defendants, and the right to enjoy personal privacy. (See, Matter of Malpica-Orsini, 36 NY2d 568, 581; Eisenstadt v Baird, 405 US 438, 447, n 7.)