**COOKIE'S DINER, INC. et al.**

v.

**COLUMBUS BOARD OF HEALTH et al.**

Franklin County Municipal Court,
Environmental Division.

No. M9406EVH–072319.

Decided Aug. 9, 1994.

**68**

*Theodore M. Grossman, Steven T. Catlett, Jeffrey S. Sutton* and *Colleen A. Deep,* for plaintiffs.

*Ronald J. O'Brien,* City Attorney, and *Thomas P. Behlen,* Assistant City Attorney, for defendant Columbus Board of Health.

*Michael Miller,* Prosecuting Attorney, *Jeffrey L. Glasgow* and *Bonnie L. Maxton,* Assistant Prosecuting Attorneys, for Franklin County District Board of Health.

RICHARD C. PFEIFFER, Judge.

### A. Overview

This matter is about whether the Columbus Board of Health ("the City Board") and the Franklin County District Board of Health ("the County Board") have the power to promulgate certain regulations relative to smoking in enclosed areas where the public is invited. This matter is not about whether those regulations are good public policy or bad public policy.

The City Board is a five-person body whose members are appointed by the head of the executive branch of the city of Columbus—the Mayor, a public official elected directly by voters who are residents of Columbus.

The County Board is a five-person body whose members are appointed by a "district advisory council." The district advisory council is composed of public officials elected directly by voters who are residents of Franklin County.

On December 14, 1993 the County Board unanimously adopted Regulation 714, which it called a "Non–Smoking Policy Regulation." That regulation contains eleven sections. The County Board did not vote separately on each section. Rather, there was only one vote taken on the eleven sections as a package.

Likewise, on December 15, 1993, the City Board unanimously adopted Resolution No. 93–7, which it called a "Non–Smoking Policy Regulation." That regulation contains eleven sections. The City Board did not vote separately on each

section. Rather, there was only one vote taken on the eleven sections as a package.

In all material respects, the two Non–Smoking Policy Regulations are identical. Additionally, prior to adopting their respective regulations, each board adopted materially identical preambles, which included the following two findings:

"[T]he Board of Health finds that smoking in enclosed areas is detrimental to the public's health, welfare, and environment and is particularly harmful to: individuals with allergies; individuals with cardiovascular or respiratory disease; children; elderly people; and individuals with impaired respiratory function, including asthmatics and those with obstructive airway disease. * * *

" * * *

" * * * [T]he Board of Health finds that smoking in certain enclosed areas is a health hazard and a physical irritation to the public. * * * "

The boards designated July 1, 1994 as the effective date of their respective regulations.

Plaintiffs in this action are owners of businesses located in Franklin County (which includes most of the city of Columbus) and in the city of Columbus (which is mostly within Franklin County). Three trade associations with members in these two areas are also plaintiffs.

On June 30, 1994, plaintiffs filed their complaint, naming the City Board and the County Board as defendants. Their complaint seeks:

1. A declaratory judgment pronouncing the regulations invalid under Ohio law;

2. A temporary restraining order temporarily enjoining the July 1, 1994 implementation of the regulations; and,

3. Injunctive relief permanently enjoining the implementation of the regulations.

On June 30, 1994, a hearing was held on plaintiffs' request for a temporary restraining order. On June 30, 1994 that request was denied.

On July 26, 1994, a consolidated hearing on plaintiffs' request for preliminary and permanent injunctive relief and on their request for a declaratory judgment was held.

### B. The positions of the parties

*Defendants' position*

It is the position of both boards that they had statutorily authorized power to promulgate smoking regulations, and that they stayed within that power in the

promulgation of their respective regulations. The City Board asserts that R.C. 3709.20 is the source of its power, while the County Board cites R.C. 3709.21 as the basis of its power.

The relevant parts of each section identically state that each board " * * * may make such orders and regulations as are necessary * * * for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances. * * * "

It is also the position of the boards, because of the severability clause in the tenth section of both regulations, that if portions of the regulations are found invalid by a court, that court must construe the remaining portions of the regulations so that they may be given effect as valid.

### Plaintiffs' position

The plaintiffs absolutely disagree with the defendant boards and advance what they say are three legal arguments to support their position of disagreement. The court believes accurate portrayals of plaintiffs' three arguments are:

1. *Boards' statutory powers do not include power to regulate smoking.* The smoking regulations "exceed the limited authority of local boards of health." Plaintiffs' trial brief at 21. That is, plaintiffs argue that the grants of power cited by the boards in R.C. 3709.20 and 3709.21 do not include the specific power to regulate smoking.

2. *Boards' regulations conflict with state law and/or are preempted by it.* Even if the boards are correct that R.C. 3709.20 and 3709.21 give them power to regulate smoking, plaintiffs argue that the boards' regulations conflict with other Ohio statutory law and must yield to that other statutory law. Plaintiffs summarize this position in their trial brief: "Black letter law confirms that local regulations may not prohibit what State law otherwise allows." *Id.* at 9.

While plaintiffs have styled this argument with a "conflict with state law" heading, the court believes that plaintiffs also have made a preemption argument against the regulations. Plaintiffs seemingly argue that since the Ohio General Assembly has enacted R.C. 3791.031 (which plaintiffs characterize as a statutory framework for the regulation of indoor smoking), such action has caused the state to "occupy" the field of indoor smoking regulation, thereby preempting the boards from acting in the field of indoor smoking regulation.

3. *Boards' regulations represent prohibited lawmaking, rather than permitted rulemaking.* Even if the boards are correct that R.C. 3709.20 and 3709.21 give them power to regulate smoking, and even if the regulations are not in conflict with state statutory law and/or are not preempted by it, plaintiffs argue that the regulations represent more than executive-branch rulemaking: they

represent legislative-branch lawmaking, an exercise of power reserved for those who hold legislative power—the elected Ohio General Assembly. Plaintiffs argue the regulations represent a usurpation of that legislative power.

## C. What is not at issue

There are several issues that some may think are or could be involved in this case which are not involved. This court believes it is useful to list what is not at issue.

### No federal issues

Plaintiffs' challenges to the validity of the boards' regulations are based solely on state law. Plaintiffs have not made any federal constitutional claims. *Operation Badlaw, Inc. v. Licking Cty. Gen. Health Dist. Bd. of Health* (June 26, 1992), S.D.Ohio No. C2–92–241, unreported, affirmed (C.A.6, 1993), 991 F.2d 796 (table), 1993 WL 113738 (unreported appellate opinion), addressed federal constitutional claims of equal protection, due process, liberty and privacy, interstate commerce and interference with existing contracts. These federal constitutional claims, which were made by a similarly situated plaintiff who challenged similar regulations, were dismissed with prejudice by the federal trial court.

That court, also having before it state claims similar to those being made by plaintiffs in this case, felt "it would be unwise to exercise supplemental jurisdiction over these claims." As a result, the state law claims in *Operation Badlaw* were dismissed without prejudice, undoubtedly with the belief that some state court would soon be found to consider the state law claims. Such prescience! Here we are.

### R.C. 3709.20 and 3709.21 are not being challenged as unconstitutional delegations of legislative power

It is a fundamental teaching in Ohio's classrooms that our government is structured to separate powers, not consolidate and concentrate them. In an attempt to assure that goal, our government is divided into three branches— legislative, executive and judicial. Each branch is then charged with exercising certain, distinct powers. This structuring and granting of powers is found in both the United States and Ohio Constitutions. Here we are concerned with only the Constitution of the state of Ohio.

Section 1, Article II, of the Ohio Constitution states in its opening sentence: "The legislative power of the state shall be vested in a general assembly consisting of a senate and house of representatives * * *."

This legislative power may not be delegated to the executive branch or the judicial branch by the legislative branch. "[T]he General Assembly * * * may

not abdicate or transfer to others the essential legislative functions with which it is vested." *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629, paragraph one of the syllabus.

Plaintiffs are not arguing that R.C. 3709.20 and 3709.21 represent unconstitutional delegations of legislative power by the General Assembly, and for good reason. Ohio's Supreme Court has at least twice said they are not.

Paragraph seven of the syllabus in *Matz v. J.L. Curtis Cartage Co.* (1937), 132 Ohio St. 271, 8 O.O. 41, 7 N.E.2d 220, states:

"As a general rule a law which confers discretion on an executive officer or board without establishing any standards for guidance is a delegation of legislative power and unconstitutional; but when the discretion to be exercised relates to a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable to provide such standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations."

Paragraph two of the syllabus in *Weber v. Butler Cty. Bd. of Health* (1947), 148 Ohio St. 389, 35 O.O. 351, 74 N.E.2d 331, states, with respect to a predecessor of R.C. 3709.21:

"Where a law relates to a police regulation for the protection of public health, and it is impossible or impractical to provide specific standards, and to do so would defeat the legislative object sought to be accomplished, such law is valid and constitutional without providing such standards. (Paragraph seven of the syllabus in *Matz, Admr. v. J.L. Curtis Cartage Co.*, 132 Ohio St., 271, 8 O.O. 41, 7 N.E.2d 220, approved and followed.)"

Both R.C. 3709.20 and 3709.21 are statutes that relate to police regulations for the protection of the public health. Both use language, *e.g.*, "may make such orders and regulations as are necessary * * * for the public health," that is susceptible of broad interpretation. Both statutes lack specific standards to help health boards define the parameters of public health, yet both statutes have been declared not to be unconstitutional delegations of legislative power.

*No challenge to the procedures followed by*
*boards in promulgating the regulations*

Plaintiffs make no challenge to the correctness of the statutory procedure the boards followed in the promulgation of their regulations. It is the substance of what was done, rather than the form, that plaintiffs challenge.

### D. Court addresses plaintiffs' arguments

The court will address each of plaintiffs' arguments in the order the court has listed them.

*Do the powers granted the boards in R.C. 3709.20 and*
*3709.21 include the power to regulate smoking?*

Even though R.C. 3709.20 and 3709.21 grant local health boards discretionary power to "make such orders and regulations as are necessary * * * for the public health," plaintiffs argue that this language does not include the power to regulate smoking. Plaintiffs reason that because the General Assembly has enacted other statutes that direct health boards to regulate relative to such specific matters as milk, ice, anabolic steroids, hospital quarantine procedures and vaccination, among others, the absence of a specific statutory direction to regulate smoking means the boards may not regulate smoking. In addition, plaintiffs argue that because the statutes lack specific guidelines to help boards define public health, health boards could claim everything to be public health, and then proceed to promulgate regulations for everything.

The Ohio Supreme Court in *Weber* and *Matz*, cited above, responded to plaintiffs' argument that public health could mean everything: public health does include much, but health boards must stay within certain general guidelines in determining what public health is. In *Weber*, the court stated:

"[I]t is recognized that there are many occasions where the nature of the problem makes it impossible to lay down standards, and as a result rule-making bodies must be allowed a wide discretion without anything as their guide except the general policy of the law-making body and the law that such bodies must not legislate or make rules which are unreasonable, discriminatory or contrary to constitutional rights." *Id.*, 148 Ohio St. at 396, 35 O.O. at 354, 74 N.E.2d at 336.

The court finds that R.C. 3709.20 and 3709.21 grant the boards wide discretion to promulgate regulations relative to the public health, and, in regulating, do not limit the boards to only those matters specifically identified by the General Assembly. If the General Assembly had intended to restrict the boards' permitted area of regulations to specifically named matters, and only those matters, the General Assembly could have done so. It chose not to. It chose not to, because in the words of *Weber*, "the nature of the problem" (the problem being the protection of the public health) is such that it is impossible to lay down precise standards to define what unheard-of or newly discovered public health hazards or diseases might be on the next horizon.

The logic of plaintiffs' argument would be that if in the boards' vigilance, and after thorough and open public hearings, the boards identify a specific health

hazard or a new disease (what is our next AIDS epidemic?), unless or until the General Assembly enacts a statute directing the boards to act on that specific new health hazard or disease, the boards could not.

*Jackson v. Franklin* (1991), 72 Ohio App.3d 431, 594 N.E.2d 1018, fails to support plaintiffs' argument that R.C. 3709.20 and 3709.21 do not include a grant of power to regulate smoking. That decision held for purposes of this analysis that the Warren County Board of Health failed to publish a proposed regulation before its adoption, and therefore the regulation had no force and effect of law. As stated earlier, there is no challenge here to the procedures the defendant boards followed in promulgating their regulations.

Likewise, *Johnson's Markets, Inc. v. New Carlisle Dept. of Health* (1991), 58 Ohio St.3d 28, 567 N.E.2d 1018, fails to support plaintiffs' argument that R.C. 3709.20 and 3709.21 do not include a grant of power to regulate smoking. While *Johnson's Markets* came fifty-four years after *Matz* and forty-four years after *Weber*, it did not overturn the rule of law of those two cases that the boards have wide discretion to regulate in the field of public health. Rather, *Johnson's Markets* held that the Ohio Department of Agriculture and local health boards both have statutory authority to regulate relative to the sanitary conditions of food establishments.

Absent the guidelines of *Matz* and *Weber*, plaintiffs would be correct that public health could mean everything. While the guidelines in *Weber* and *Matz* are broad, they are guidelines. So long as the boards promulgate regulations designed to promote the general policy of the General Assembly to protect the public health, and so long as the regulations are reasonable, nondiscriminatory, and not contrary to constitutional rights and to legislation, the regulations would be valid.

Defendant boards identified smoking in enclosed areas as a public health issue after a series of announced and well-attended public hearings. There was no secrecy, and no sudden "springing upon the unsuspecting" of their smoking regulations. No member of the public was denied access to the boards for purpose of offering information relative to the effects of tobacco smoke on nonsmoking persons who breathed the air of public enclosed areas that contained tobacco smoke.

It may be fairly argued that the boards' employees and consultants were selective in what they gave the boards for the boards' deliberations. Plaintiffs also may be correct that there is competing scientific literature relative to conclusive determinations whether the air of enclosed areas which contains tobacco smoke and is breathed by nonsmokers causes cancer in those persons. However, the record indicates that defendant boards, acting with deliberation and

public openness, considered extensive scientific information and did not act arbitrarily or unreasonably in the public process they undertook before making their finding of fact "that smoking in enclosed areas is detrimental to the public's health," and subsequently promulgating the regulations to regulate such smoking.

## Finding

The court concludes as a matter of law that the power to regulate smoking is contained within the statutory powers granted the defendant boards in R.C. 3709.20 and 3709.21.

Whether the regulations are in conflict with state law and/or preempted by state law, whether they represent prohibited lawmaking rather than permitted rulemaking, and whether they are unreasonable, discriminatory or contrary to constitutional rights are matters to be determined next.

### Are the boards' regulations in conflict with state law and/or are they preempted by R.C. 3791.031?

Plaintiffs argue that the most glaring defect in defendant boards' smoking regulations is that they are in conflict with existing statutory law—that statutory law being R.C. 3791.031. Citing several cases in support, including *Lorain v. Tomasic* (1979), 59 Ohio St.2d 1, 13 O.O.3d 1, 391 N.E.2d 726, plaintiffs state, "Black letter law confirms that local regulations may not prohibit what State law otherwise allows." Plaintiffs' trial brief at 9.

In *Tomasic* the city of Lorain's legislative authority (its city council) had enacted an ordinance limiting to $1,200 the maximum a bingo operator could pay out in any one bingo session. The General Assembly, the state's legislative authority, had earlier enacted a statute limiting to $3,500 such maximum pay out. The *Tomasic* court wrote: "As part of the regulatory scheme the General Assembly has indicated that once a charitable organization is properly licensed, it has a right, pursuant to [statute], to pay out up to, but no more than, $3,500 at any bingo session." *Id.*, 59 Ohio St.2d at 3, 13 O.O. at 2, 391 N.E.2d at 728.

In determining whether this situation in fact created a conflict between the operation of Lorain's limit of $1,200 and the state's limit of $3,500, the *Tomasic* court looked to the guidance found in *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, at paragraph two of the syllabus: "In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa."

The *Tomasic* court applied this test from *Struthers* and concluded that since Lorain's ordinance prohibited the $3,500 payout per session, which the state

statute permitted, Lorain's ordinance was in conflict with the statute and was, therefore, invalid.

Plaintiffs draw attention to R.C. 3791.031, a statute which they call "an extensive scheme of public smoking regulations." Plaintiffs' trial brief at 12. This statute, plaintiffs argue, either permits or prohibits what defendant boards' regulations do not. Does it?

R.C. 3791.031 defines a "place of public assembly" as a building or enclosed structure, but only certain buildings and enclosed structures. The statute then directs local fire authorities, the director of the Ohio Department of Administrative Services, legislative authorities of local political subdivisions, the Ohio Senate's Rules Committee, the Ohio House of Representatives' Rules Committee and proprietors of certain private businesses to designate no-smoking areas in the places of public assembly under their respective control. The statute is silent relative to local health boards. It neither gives them nor denies them a role in designating no-smoking areas in places of public assembly.

The statute also neither prohibits nor permits the designation of smoking areas (as contrasted to no smoking areas) in places of public assembly. Yet the statute does permit the designation of part or all of the place of public assembly as a no-smoking area. Quoting from the relevant part of paragraph (B) of the statute, "A no smoking area may include the entire place of public assembly."

Defendant boards' regulations do designate entire places of public assembly as no-smoking areas. The regulations also designate as no-smoking areas buildings and enclosed structures that R.C. 3791.031 left out of its definition of a "place of public assembly." There is nothing in the statute confining health boards in their actions to places of public assembly as defined by the General Assembly in R.C. 3791.031.

The City Board's counsel has argued that if the General Assembly intended the local fire authorities (and the others listed) to be the exclusive designators of no-smoking areas, the General Assembly would have written such language of exclusion into the statute, as the General Assembly did in R.C. 4727.13, where one agency of government was specifically designated as the sole regulator in Ohio of a particular business. Additionally, the court finds that *DeMoise v. Dowell* (1984), 10 Ohio St.3d 92, 10 OBR 421, 461 N.E.2d 1286, also supports this view.

The issue in *DeMoise* was whether a county health board could use its R.C. 3709.21 powers to order households whose private septic systems were functional to hook up to sanitary sewage lines whose construction and utilization were governed by county commissioners, pursuant to R.C. Chapter 6117. The court answered "yes." The fact that R.C. Chapter 6117 permitted county commissioners to construct and utilize sanitary sewer lines, with no specific mention of any

role to be played by a county local health board, did not mean such board was without statutory power to enter the field of sanitary sewer line use if the board made a finding that public health was at issue.

"While it is true that the legislature has delegated some authority regarding sewers under R.C. Chapter 6117, the General Assembly has also enacted an alternative and more comprehensive scheme of delegation of authority concerning public health. * * * " *DeMoise*, 10 Ohio St.3d at 94, 10 OBR at 423, 461 N.E.2d at 1289. R.C. 3709.21 was cited as part of that alternative and comprehensive scheme concerning public health.

"Appellees [the households being forced to hook up] contend that R.C. 3709.21 does not authorize a board of health to force citizens to connect to a sanitary sewer. They argue that Sections 2.12 and 2.13 [the county board's regulations promulgated to force the hookups] go beyond the mere protection of public health * * *." *DeMoise*, 10 Ohio St.3d at 95, 10 OBR at 423–424, 461 N.E.2d at 1290. The court rejected this argument and found that even though county commissioners were mentioned in R.C. Chapter 6117 as the only authority to construct and utilize sanitary sewage lines, the lack of the specific mention of local health boards did not stop the county board from using its broad power under R.C. 3709.21 to enter the field for the protection of the public health.

All parties here cite many other cases in support of their positions that there is or is not a conflict of law situation or a preemption situation. The court will not address each case, but rather indicate that it finds *Middleburg Hts. v. Ohio Bd. of Bldg. Standards* (1992), 65 Ohio St.3d 510, 605 N.E.2d 66, and *Johnson's Markets*, cited earlier, as well as *DeMoise* and *Struthers*, to be conclusive in supporting defendant boards' position that their regulations are not in conflict with state statutory law and are not preempted by existing statutory law.

In *Johnson's Markets*, the plaintiff sought a declaratory judgment to declare certain local health boards' regulations invalid because they conflicted with or were preempted by statutory law.

The following narrative from *Johnson's Markets* sets the stage for the Supreme Court's consideration:

"The trial court found that no section of the Revised Code granted a local department of health specific authority to prescribe sanitary standards for food establishments. The trial court further found that only the Director of Agriculture has the authority [R.C. 913.41 and 913.42] to prescribe sanitary regulations for food establishments. The court further found the New Carlisle Department of Health regulation to be invalid and enjoined it from issuing or enforcing orders pursuant to its general sanitary regulation of food establishments.

"The court of appeals reversed the trial court in all respects." *Id.*, 58 Ohio St.3d at 31, 567 N.E.2d at 1021.

The unanimous decision of the Supreme Court in *Johnson's Markets* affirmed the judgment of the court of appeals, and in doing so held:

"This court, construing R.C. 3709.20, 3709.22, 913.41 and 913.42 *in pari materia*, considering the legislative intent of the Ohio General Assembly, and applying the statutory rules of construction provided in R.C. 1.51, holds that the Ohio Department of Agriculture does not have exclusive authority to regulate the sanitary conditions of food establishments." *Id.*, 58 Ohio St.3d at 37, 567 N.E.2d at 1027.

Finally, the court stated: "In conclusion, if it had been the desire of the General Assembly to grant the Director of Agriculture the exclusive jurisdiction to regulate or inspect the sanitary conditions of food establishments in Ohio to the exclusion of city health districts, it would have done so by appropriate statutory amendments." *Id.* at 37–38, 567 N.E.2d at 1027. This language echoes what the City Board's counsel also argued when making reference to the General Assembly's actions in R.C. 4727.13.

In *Middleburg Hts.* the Supreme Court held that certain provisions of the city code of a local political subdivision which provided stricter fire protection requirements than those prescribed by the Ohio Basic Building Code (OBBC) were not in conflict with the state's less strict standards contained in the OBBC; rephrased, the less strict state standard did not prohibit the city of Middleburg Heights from enacting a stricter local standard.

The OBBC, which includes fire protection standards, had been adopted by the Ohio Board of Building Standards as the uniform minimum standards and requirements for construction and construction material in Ohio. The Supreme Court found that while the Middleburg Heights' fire protection requirements were tougher than the minimum standards adopted by the State Board of Building Standards, the fact they were tougher did not put them in conflict with the lesser minimum standards found in the OBBC. The court stated: "[W]e hold that absent any specific statutes limiting local regulations, the OBBC provides only minimum building requirements in Ohio." *Id.*, 65 Ohio St.3d at 513, 605 N.E.2d at 68. The state's no-smoking standards in R.C. 3791.031 are less strict than those found in defendant boards' regulations. R.C. 3791.031 represents the minimum state standard above which local health boards may impose stricter standards.

## Finding

As a matter of law this court concludes that defendant boards' regulations are not in conflict with state law, nor are they preempted by the smoking regulations enacted in R.C. 3791.031.

Having found nothing in the boards' regulations that permits that which the statute prohibits, or prohibits that which the statute permits, or is preempted by state law, the court next considers whether the extent to which the regulations dictate human behavior go beyond the wide-discretion latitude of R.C. 3709.20 and 3709.21 and into lawmaking territory—the exclusive domain of the legislative branch.

*Do the boards' regulations represent prohibited lawmaking rather than permitted rulemaking?*

Plaintiffs' final argument against defendant boards' regulations is that even if the court is correct in its conclusion of law that R.C. 3709.20 and 3709.21 contain within them grants of power to regulate smoking, and even if the court is correct in its conclusion of law that the boards' regulations are not in conflict with existing state law and are not preempted by the provisions of R.C. 3791.031, the boards' regulations, even with the wide discretion the court said is granted, have gone beyond permitted rulemaking and in fact represent prohibited lawmaking.

While the boards found as fact that smoking in enclosed areas is detrimental to the public's health, the boards' regulations do not regulate smoking in all enclosed areas. Private enclosed areas are exempted totally. Within public enclosed areas, some areas are exempted. Among the public enclosed areas that are not exempted, the regulations vary depending on the type of human activity carried on in the enclosed areas.

For example, a bar's owner could choose to make his or her enclosed area of business either all smoking or all no-smoking, so long as the public invited into the bar clearly knew which option had been chosen. But a bowling alley operator or a restaurant operator has no such "all or none" choice to offer the public in the conduct of his or her business in its enclosed areas. Either a restaurant operator will be offering the public an all no-smoking enclosed area in the conduct of his or her restaurant business, or (for three years after July 1, 1994) both a no-smoking enclosed area and a smoking-enclosed area.

For a restaurant operator to be able to offer the public both a no-smoking and smoking-enclosed area choice in the conduct of its business, that operator must demonstrate that he or she can construct his or her restaurant so as to have a "functional and meaningful" separation between the enclosed-smoking and no-smoking areas of the business. If the restaurant operator cannot demonstrate this, the operator can only offer the public a no-smoking enclosed area. For the first three years of the regulations some restaurant operators will be able to offer the public only a no-smoking enclosed area in the conduct of their businesses, while other restaurant operators will be able to offer the public both a smoking-enclosed area and a no-smoking enclosed area in the conduct of their businesses.

Last, some operators of businesses in enclosed areas open for public use may be granted variances as to how the regulations apply to their operations if those operators can demonstrate to an appointed Smoking Variance and Advisory Board "that because of practical difficulties or other special conditions their [the regulations'] application will cause unusual and unnecessary hardship. However, no variance shall be granted that will defeat the spirit and general intent of said regulation, or be otherwise contrary to the public interest." The quoted language is from paragraph b of Section 6 of the regulations.

*Weber* and *Johnson's Markets* have already been invoked by this court against two of plaintiffs' arguments. Consider now what *Weber* and *Johnson's Markets* say relative to plaintiffs' remaining argument that these regulations are prohibited lawmaking:

" * * * Furthermore, we conclude that any such regulations adopted by the local health districts must be limited to these consideration of protecting the public health, preventing disease, and abating nuisance." *Johnson's Markets*, 58 Ohio St.3d at 36–37, 567 N.E.2d at 1026.

"[R]ule-making bodies must be allowed a wide discretion without anything as their guide except the general policy of the law-making body and the law that such [rule-making] bodies *must not legislate or make rules which are unreasonable, discriminatory or contrary to constitutional rights.*" (Emphasis added.) *Weber*, 148 Ohio St. at 396, 35 O.O. at 354, 74 N.E.2d at 336.

Throughout the regulations run currents of concern that seem to be other than solely public health concerns. Defendant boards offered a witness who testified that one concern of the boards was whether the regulations could be successfully enforced in bars, a public gathering place where apparently many if not most members of the public who enter smoke as well as consume alcoholic beverages. The variance procedure controlled by the appointed Smoking Variance and Advisory Board also seems to suggest other than public health concerns were considered by the boards, without specifically naming those concerns. What are the "practical difficulties or other special conditions" which will be of concern to the appointed Smoking Variance and Advisory Board when it considers whether or not to grant a variance? Within the exemption section there appears to be an economic concern that some businesses in the boards' jurisdictions would suffer economic loss if a strict no-smoking standard were applied to those businesses.

The rule in *Weber* specifically states that any regulations may not be discriminatory. Yet, within the class of restaurant operators, at least for the first three years of the regulations' operations, discrimination exists in how the regulations will affect business among restaurant operators. Some restaurant operators will not be able to offer both smoking and no-smoking areas in the conduct of

business, while others, presumably the larger, economically able ones, will be able to do so.

New York state's highest appellate court considered similar issues to those presented here and concluded that the Public Health Council of the state of New York "transgressed the line that separates administrative rule making from legislating and thereby exceeded its statutory powers." *Boreali v. Axelrod* (1987), 71 N.Y.2d 1, 16, 523 N.Y.S.2d 464, 472, 517 N.E.2d 1350, 1357.

While the *Boreali* court struck down the executive agency's rules, a substantially similar no-smoking scheme subsequently enacted by the legislature of the state of New York was upheld as valid in *Fagan v. Axelrod* (1990), 146 Misc.2d 286, 550 N.Y.S.2d 552.

The *Fagan* decision states:

"The use of considerations of spatial dimensions and proximity of smokers to non-smokers in certain instances, and complete prohibition of smoking in others, represents an accommodation between the desire to limit the exposure of non-smokers to tobacco smoke and relevant economic and social considerations. The Legislature, with authority to do so, accepted concerns that completely prohibiting smoking at such places as food service establishments, bingo halls and bowling alleys would have a substantial adverse impact on patronage thereat. Thus reasonable compromises were resolved upon, requiring the designation of non-smoking areas to protect the health of those patrons not wishing to be exposed to tobacco smoke. Ventilation devices and air cleaners were further found by the Legislature not to be an effective substitute. *It was within their power to so find.*" (Emphasis added and footnote omitted.) *Id.* at 297–298, 550 N.Y.S.2d at 559.

Thus, it was within the legislative power of New York's legislature to pass such legislation, but not within the power of the executive branch's public health council to do so.

██ Defendant boards must stay within their R.C. 3709.20 and 3709.21 grants of power in the regulating of smoking for the protection of public health. The court finds that the boards, having made the finding of fact that smoking in enclosed areas is detrimental to the public's health, chose to consider concerns (such as enforceability and economics) other than those solely for the protection of the public health (*Johnson's Markets*). The court also finds that there is no reasonable and nondiscriminatory rationale (*Weber*) that permits the boards to make variances and exceptions for the protection of the public health relative to smoking in enclosed areas open to the public, since the effect of the variances and exemptions discriminates among operators in their abilities to offer their businesses to the public on an equal footing.

The Supreme Court in *Schlenker v. Auglaize Cty. Gen. Health Dist. Bd. of Health* (1960), 171 Ohio St. 23, 12 O.O.2d 42, 167 N.E.2d 920, held in paragraph one of the syllabus: "It is within the scope of the police power to require, for the protection of the public health, that all milk for human consumption must be pasteurized." All milk for human consumption must be pasteurized, not milk consumed in some places but not consumed in other places. Similarly, once a local health board finds that smoking in enclosed areas is detrimental to the public's health, where does that board then acquire power to discriminate among those that operate businesses in those enclosed areas, by regulating smoking in some enclosed areas and not in others? If the power to discriminate is to be exercised, that power belongs to the legislative branch of government not the executive branch.

■ The exemption section and the variances procedure section of the regulations represent classic public policymaking—the balancing of competing interests to arrive at a result that will be accepted by the majority.

The County Board would direct attention to *Ex parte Company* (1922), 106 Ohio St. 50, 139 N.E. 204, in an effort to refute the argument that the regulations, because they discriminate among those that operate differing and/or similar businesses within public enclosed areas and because they consider other than public health concerns, represent prohibited lawmaking by the boards.

Before moving directly to *Ex parte Company*, a word about *Zucht v. King* (1922), 260 U.S. 174, 43 S.Ct. 24, 67 L.Ed. 194, and *State ex rel. Adams v. Burdge* (1897), 95 Wis. 390, 70 N.W. 347, will be helpful because the quote from *Ex parte Company* that the County Board directs us to mentions these two cases.

*Zucht* dealt with a San Antonio, Texas ordinance which provided that no child or other person could attend public school or other place of education without having first presented a certificate of vaccination. Acting on this legislative directive, the executive branch health board of San Antonio excluded Ms. Zucht from public school because she did not have the required certificate and refused to submit to vaccination. The health board also excluded her from a private school.

After filing her complaint for injunctive relief, the following history developed: "A general demurrer to the bill of complaint was sustained by the trial court; and, plaintiff having declined to amend, the bill was dismissed." *Zucht*, 260 U.S. at 175, 43 S.Ct. at 25, 67 L.Ed. at 197. Plaintiff exhausted her state appeals, losing at every step, then petitioned the United States Supreme Court for a writ of certiorari, which was dismissed for a procedural error. Using a procedure then available, the matter was eventually assigned to the United States Supreme Court on a writ of error. As stated by Justice Brandeis: "The validity of the

ordinances under the federal constitution was drawn in question by objections taken below." *Id.,* 260 U.S. at 176, 43 S.Ct. at 25, 67 L.Ed. at 198. The Supreme Court denied the writ because it did not find any substantial federal constitutional questions.

*Burdge* concerned a Wisconsin situation where there was a general statute similar to R.C. 3709.20 and 3709.21, but no specific statute requiring vaccination of children before they attended school, although there was a state health board rule which made such vaccination mandatory. The Wisconsin Supreme Court declared the rule invalid.

*Ex parte Company* concerned a person arrested and quarantined by Akron authorities because she was found to be infected with contagious disease— syphilis and gonorrhea. Ms. Company argued that her quarantine violated her federal and Ohio constitutional rights to due process, that the local health board rule authorizing her quarantine was in conflict with a statute, and that the local rule represented a delegation of legislative power.

Defendant County Board directs attention to the following language of *Ex parte Company*:

"The right to quarantine by exclusion has been upheld in the recent case of *Zucht v. King,* decided by the Supreme Court of the United States on November 13, 1922, 43 S.C.Rept., 24. Mr. Justice Brandeis in the opinion regards and states it as:

"(1) 'Settled that a state may, consistently with the federal Constitution, delegate to a municipality authority to determine under what conditions health regulations shall become operative.'

"(2) 'Settled that the municipality may vest in its officials broad discretion in matters affecting the application and enforcement of a health law.'

"(3) 'Settled that in the exercise of the police power reasonable classification may be freely applied, and that regulation is not violative of the equal protection clause merely because it is not all-embracing.'

"We do not subscribe to either the principle or pronouncement of the *Burdge case.* We prefer and adopt the latest judgment of the supreme court of the United States. It is founded in reason and sustained by authority." *Id.,* 106 Ohio St. at 60, 139 N.E. at 207.

Following the drawing of attention to the above quoted language, the County Board states at page 20 of its brief:

"It is disingenuous to argue that the regulations are an unlawful delegation of legislative authority because they are under-inclusive. In any event, the Ohio Supreme Court rejected exactly this argument in *Ex parte Company, supra,*

citing *Zucht, supra,* for the proposition that a regulation is not violative of the Equal Protection Clause merely because it is not all-embracing."

This court disagrees with the County Board's characterization of what *Ex parte Company* held.

First, there is no argument here that the regulations are "an unlawful delegation of legislative authority." The argument here is that even though the boards have wide discretion under R.C. 3709.20 and 3709.21, that wide discretion has been exceeded to the point that the regulations represent lawmaking.

Second, neither the validity of R.C. 3709.20 and 3709.21 nor the validity of defendant boards' regulations is here challenged under federal constitutional claims. Such claims were dismissed with prejudice when similar regulations were challenged in *Operation Badlaw,* cited earlier. No one here is challenging these regulations as being violative of the Equal Protection Clause of the United States Constitution. Rather, the validity of these regulations is being challenged on state claims under the laws of Ohio. Particularly, they are being challenged here as a usurpation of legislative power.

Third, the language of the Supreme Court in *Weber* and *Johnson's Markets,* directing that local health board's regulations must not be discriminatory or represent legislation, did not overrule or distinguish the language of *Ex parte Company.* As did *Ex parte Company* not follow *Burdge,* there is nothing in the language of *Weber* or *Johnson's Markets* to suggest that they would have followed *Burdge.*

Last, the issue in *Ex parte Company* and *Zucht* was the right to quarantine by exclusion, and nowhere in the exercise of that right did the court in *Ex parte Company* find an ability of the rulemaking body to discriminate regarding that right. The health board regulations in *Ex parte Company* dealt with the quarantine of persons arrested and found to be infected with the diseases of syphilis and gonorrhea. All such persons similarly situated with the same diseases were treated similarly by the regulations—they were quarantined by being excluded from others. As noted in *DeMoise,* the sanitary regulations which the court found the health board had power to promulgate were uniform and did not discriminate: "The sewer connection requirement is uniformly applicable and does not provide for discretionary exemptions." *Id.,* 10 Ohio St.3d at 97, 10 OBR at 425, 461 N.E.2d at 1291.

### Finding

The court concludes as a matter of law that the regulations promulgated by defendant boards represent a usurpation of legislative power. The regulations represent prohibited lawmaking rather than permitted rulemaking.

■ Can part of the regulations be saved? Does the fact that the boards included a severability section in the regulations require a court to carve out what the court has found to be prohibited lawmaking, and save what the court might find to be permitted rulemaking?

Having concluded as a matter of law that the defendant boards' eleven-section package of regulations taken as a whole represents invalid lawmaking by an executive body that has the power only to make rules, may parts of the regulations be saved as valid if the parts are found to be the product of valid rulemaking? Is the court required by law and by the direction of the tenth section of each package of regulations to construe the regulations, edit out the invalid portions, if you will, so that what remains can be found to be valid and effective smoking regulations?

Counsel for the City Board argues that this court, if it found the regulations invalid as legislation, should follow section ten of the regulations and must follow *O'Brien v. Columbus S. Power Co.* (1992), 73 Ohio App.3d 355, 597 N.E.2d 188, and construe what the boards promulgated so as to make effective as much of the regulations as possible.

"[I]f we [the three-member panel of a court of appeals] are able to construe a statute, or significant portions of it, in such a way as to comply with applicable requirements of constitutional law, we are bound to do so." *Id.*, 73 Ohio App.3d at 360, 597 N.E.2d at 191. The *O'Brien* court makes this conclusion after examining R.C. 1.50, which reads:

"If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable."

■ Were the matter before this court ordinances or statutes enacted by elected legislators, then this court would agree that *O'Brien* and R.C. 1.50 apply. However, this officer of the judicial branch of government will not act as part of the legislative branch of government, or as a member of an appointed executive branch board, and participate in the making of public policy. The making of public policy is not within a court's power, just as it is not within the power of the executive branch.

The New York Court of Appeals in *Boreali v. Axelrod, supra,* 71 N.Y.2d at 14, 523 N.Y.S.2d at 471, 517 N.E.2d at 1356–1357, stated the following when considering whether to use the severability clause of the New York Public Health Council's smoking regulations:

" * * * It would be pragmatically impossible, as well as jurisprudentially unsound, for us to attempt to identify and excise particular provisions while leaving the remainder of the PHC's antismoking code intact, since the product of such an effort would be a regulatory scheme that neither the Legislature nor the PHC intended."

This court finds agreement with that observation.

Each board had before it on the day of its respective vote one eleven-section package of regulations. The package the County Board had before it on December 14 was identical to the package the City Board had before it on December 15. At no time during either meeting did a member of either board make a motion to amend any part of the eleven-section package. It was up or down, "yes" or "no," on identical regulations presented to each board. Each board chose to adopt the identical package of regulations and only that package. Notwithstanding the inclusion of a severability clause, had there been any alteration to the eleven-section package before the one vote on adoption was taken would either board have voted for that altered package? And if one board had acted differently than the other, would either have voted out different regulations?

Last, if a court edits what the boards did, in an effort to save parts of what the boards did, would the boards have voted on their own for the edition created by the court, not knowing in advance how the court would edit their work? For a court to edit these regulations would be the same as having the court sit as a member of the defendant boards. And just as the boards are not part of the legislative branch of government, this court is not part of the executive branch represented by the boards of health.

The court concludes as a matter of law that it is not required by law, nor would it be jurisprudentially sound, to construe the regulations so as to select from among them those parts that will go into effect and those parts that will not.

## DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

For the reasons discussed above, it is the conclusion of this court that the regulations promulgated by defendant boards represent a usurpation of legislative power.

IT IS THEREFORE ORDERED, ADJUDGED AND DECLARED that the regulations are invalid as prohibited lawmaking rather than permitted rulemaking; and,

IT IS FURTHER ORDERED AND ADJUDGED that defendant boards are permanently enjoined from the further enforcement of the regulations; and,

IT IS FURTHER ORDERED AND ADJUDGED that any pending criminal and/or civil actions, if any, brought to enforce the regulations are hereby declared void and without effect and are dismissed.

This is a final, appealable order. The clerk is directed to immediately notify the parties of the date of the entry of this Declaratory Judgment and Permanent Injunction on the journal.

*So ordered.*