THE STATE, EX REL. MESHEL, *v.* KEIP, DIR., ET AL.

(No. 81-153—Decided June 10, 1981.)

380

■■■■■■■■

*Messrs. Wilkowski & Bloom* and *Mr. Arthur Wilkowski,* for relator.

*Mr. William J. Brown,* attorney general, and *Mr. Alphonse P. Cincione,* for respondents.

CELEBREZZE, C. J.   As stated in the first paragraph of the syllabus in *State, ex rel. Heller,* v. *Miller* (1980), 61 Ohio St. 2d 6:

"In order to grant a writ of mandamus, the court must

find that relator has a clear legal right to the relief prayed for, that respondent is under a clear legal duty to perform the requested act, and that relator has no plain and adequate remedy at law."

The action of the Controlling Board was not quasi-judicial in nature. As a consequence there is no adequate remedy at law.

Respondents argue, however, the relator is not entitled to the requested relief because of the board's failure to apply to the Director of Administrative Services for a certificate allowing encumbrancy.

R. C. 131.17 states:

"No contract, agreement, or obligation involving the expenditure of money entered into by any department, office, board, commission, or other agency of the state, nor any resolution or order for the expenditure of money passed by any such entity, shall be valid and enforceable, unless the director of administrative services first certifies that there is a balance in the appropriation, not already obligated to pay existing obligations. Any such certification or proposed certification may be reviewed by the office of budget and management which may order that it be withdrawn, modified, or not made, pursuant to section 126.02 of the Revised Code. Any written contract or agreement entered into by the state shall contain a clause stating that the obligations of the state are subject to the provisions of this section."

R. C. 126.02 states, in part:

"The office of budget and management shall have power to exercise control over the financial transactions of all departments, offices, and institutions, except the judicial and legislative departments, as follows:

"* * *

"(D) By reviewing accounts and the disposition and use of the public property, and by supervising and examining the expenditures and receipts of public money in connection with the administration of the state budget;

"(E) By prescribing the manner of certifying that funds are available and adequate to meet contracts and obligations."

F. Martin Rookard, a former employee in the fiscal section of ORTA, stated in an affidavit that applications for encum-

brancy had been filed by ORTA in the past with the Office of Budget and Management in the same manner as was done in the case at bar. We can find no rule requiring delivery to the Director of Administrative Services of such applications. Because the Office of Budget and Management is in charge of promulgating such rules, and because it permitted ORTA to submit applications through its offices in the past, relator is not precluded from mandamus relief due to the failure of ORTA to submit an application directly to Wilkins.[1]

Respondents also contend that they are not under a clear legal duty to certify encumbrancy because (1) the transfer of the funds, even if contrary to law, has effectively removed the funds from the account, and (2) because the actions of the Controlling Board were lawful.

In *State, ex rel. Kauer,* v. *Defenbacher* (1950), 153 Ohio St. 268, this court held in paragraph one of the syllabus, as follows:

"In the event there is money in a state fund, available for the purpose for which it is sought, it is the ministerial duty of the Director of Finance, upon proper submission of an encumbrance estimate or certificate for the purpose of encumbering such money for such purpose, to make the certification required by Section 2288-2, General Code. The discharge of this duty may be compelled by mandamus."

Under current statutory law, the Director of Administrative Services, pursuant to R. C. 131.17, and the Director of the Office of Budget and Management, pursuant to R. C. 126.02, have replaced the Director of Finance in the certification process. These officers are under a ministerial duty to certify availability provided there is money in the fund which could be spent for the proposed purpose. If the action of the Controlling Board was contrary to law, it is void and such money would be available.

It would then be appropriate to issue a writ of mandamus.[2] Thus, the issue before this court is whether the Controlling

---

[1] It is clear that relator has standing as a taxpayer to bring this action. See *State, ex rel. Nimon,* v. *Springdale* (1966), 6 Ohio St. 2d 1, paragraph four of the syllabus.

[2] Respondents do not deny that the Dalton contract is not contrary to the purpose of the appropriation.

Board can lawfully transfer funds as it did on January 26, 1981.

Pursuant to R. C. 127.12, the Controlling Board consists of seven members—three from each house of the General Assembly and either the Director of the Office of Budget and Management or his appointee.

R. C. 127.14 states, in part:

"The controlling board may, at the request of any state agency or the director of budget and management, authorize with respect to the provisions of any appropriation act:

"* * *

"(B) Transfers of all or part of an appropriation from one fiscal year to another."

Relator argues that the transfer was unlawful because the board has been unconstitutionally delegated legislative authority and because the board or its actions are unconstitutional because six of its seven members are legislators who are appointed under R. C. 127.12 by the General Assembly. In addition, relator contends that the transfer of ORTA funds made on January 26, 1981, was void because ORTA did not receive sufficient notice of that meeting and because the transfer was beyond the board's authority.

Respondents initially contend that this court should not review actions taken by the Controlling Board pursuant to R. C. 127.14(B) because they are essentially legislative in character, and issues regarding them constitute political questions best left to the legislative branch of government.

In *Baker* v. *Carr* (1962), 369 U.S. 186, the United States Supreme Court discussed the justiciability of political questions, linking that limitation of judicial power to the separation of powers inherent in our political system. In *Baker,* the court stated, at page 217:

"* * * Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due

coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority.***"

As delineated in *Baker,* this limitation on judicial power is a narrow one. The areas recognized by the United States Supreme Court in *Baker* involve foreign relations, war powers, the process of ratifying constitutional amendments and enacting statutes, the status of Indian tribes, and the guaranty clause (Section 4 of Article 4) of the United States Constitution. This court has applied the doctrine primarily in election cases. See *State, ex rel. Ford,* v. *Bd. of Elections* (1958), 167 Ohio St. 449; *Williams* v. *O'Neill* (1944), 142 Ohio St. 467; *McClintock* v. *Sweitzer* (1941), 138 Ohio St. 324.

Section 1, Article II of the Ohio Constitution, states, in part:

"The legislative power of the state shall be vested in a general assembly consisting of a senate and house of representatives but the people reserve to themselves the power to propose to the general assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided.***"

Section 26 of Article II states:

"All laws, of a general nature, shall have a uniform operation throughout the state; nor, shall any act, except such as relates to public schools, be passed, to take effect upon the approval of any other authority than the general assembly, except, as otherwise provided in this constitution."

It is the General Assembly, not a body consisting of six legislators and a member from the executive branch, which is granted the legislative power. The unfettered delegation of power to such a body is not the constitutional prerogative of the General Assembly; however, the judicial branch of this

state is the appropriate body to assess the legitimacy of the delegation and of the use of any power granted. The issues of the constitutionality of the Controlling Board and of the lawfulness of its actions are, therefore, justiciable. As a consequence, we refuse to extend the political question doctrine to this case.

Because the General Assembly cannot delegate its legislative authority, the Controlling Board cannot make laws. As stated, in *Matz* v. *J. L. Curtis Cartage Co.* (1937), 132 Ohio St. 271, at pages 280-281:

"If such general rule-making power could be conferred indiscriminately, the Legislature could meet, create commissions, pass on to them the duties of legislation and then adjourn *sine die*. Without restrictions on the commission's power, rules and regulations of whatever kind could be adopted by it without notice, and changed overnight. The result would be that statutory law would lose its significance and legal rights would be grounded in great measure upon the readily alterable rules and regulations of boards and commissions. Thus the constitutional right of referendum would be denied, government would be given over to the despotic rule of administrative authorities and bureaucracy would run wild."

Respondents contend, however, that the Controlling Board can be delegated essentially legislative authority because the General Assembly can reenact any appropriation transferred by the board. The fact the General Assembly can reenact a law is irrelevant. If it were relevant, any agency could be granted unbounded discretion to make rules because the General Assembly could override those rules. Such a holding does not recognize the realities of our bicameral legislative process; it would allow a board of relatively small size to override the result of the rather involved legislative process. This is not proper under our Constitution.

It is, of course, necessary that administrative bodies (the Controlling Board essentially being one) be able to exercise discretion. Consequently, a distinction has traditionally been made between the delegation of legislative authority and the conferring of discretionary administrative authority. In an opinion by Judge Ranney in *Cincinnati, W. & Z. RR. Co.* v. *Commrs. of Clinton County* (1852), 1 Ohio St. 77, this court held, at pages 88-89:

"***The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

As a result of this distinction, it has been consistently held that there must be some discernable limits on the actions of administrative bodies or officers. *Blue Cross* v. *Ratchford* (1980), 64 Ohio St. 2d 256; *Weber* v. *Bd. of Health* (1947), 148 Ohio St. 389; *Matz, supra.*

Historically this court required that specific standards be established over administrative action, and recognized as exceptions to this requirement cases in which the discretion to be exercised related to a police power and those where it was impossible or impractical to provide standards. *Matz, supra.* In *Ratchford,* however, we adopted a more flexible approach, holding in the syllabus of that case:

"A statute does not unconstitutionally delegate legislative power if it establishes, through legislative policy and such standards as are practical, an intelligible principle to which the administrative officer or body must conform and further establishes a procedure whereby exercise of the discretion can be reviewed effectively."

R. C. 127.17 states:

"The controlling board shall take no action which does not carry out the legislative intent of the general assembly regarding program goals and levels of support of state agencies as expressed in the prevailing appropriation acts of the general assembly."

When an appropriation is made for a specific year, the General Assembly implicitly indicates an intent to appropriate those funds for the designated year. The Controlling Board can transfer those funds to another year only if there is some indication, implied or express, of a legislative intent to allow such action. Such an intent is often implicit in the program goals which lie behind the appropriation.

Standards are clearly an impractical means of limiting the authority given the board pursuant to R. C. 127.14(B). The policy limitations or transfers, when combined with the avail-

ability of mandamus relief,[3] sufficiently limit the authority granted the Controlling Board in R. C. 127.14(B). Therefore, we hold that the General Assembly did not unconstitutionally delegate legislative authority to the Controlling Board in allowing it to transfer funds from one fiscal year to another, pursuant to R. C. 127.14(B), because, pursuant to R. C. 127.17, such transfers cannot be contrary to the legislative intent regarding program goals and levels of support.

Relator's contention that the board or its actions are unconstitutional because six of its seven members are legislators is based on Section 4, Article II of the Ohio Constitution, which states in part:

"No member of the general assembly shall, during the term for which he was elected, unless during such term he resigns therefrom, hold any public office under the United States, or this state, or a political subdivision thereof; but this provision does not extend to officers of a political party, notaries public, or officers of the militia or of the United States armed forces."

In *State, ex rel. Herbert,* v. *Ferguson* (1944), 142 Ohio St. 496, this court, at page 501, stated:

"A 'civil office' or a public office of a civil nature, as defined by the Ohio cases, is a charge or trust conferred by public authority for a public purpose, with independent and continuing duties, involving in their performance the exercise of some portion of the sovereign power."

Although the term used in Section 4 of Article II is "public office," the meaning is essentially the same as "civil office." An exercise of some portion of the sovereign power must be involved.

In *State, ex rel. Landis,* v. *Bd. of County Commrs.* (1917), 95 Ohio St. 157, this court stated, at pages 160-161:

"***If specific statutory and independent duties are imposed upon an appointee in relation to the exercise of the police powers of the state, if the appointee is invested with independent power in the disposition of public property or with power to incur financial obligations upon the part of the

[3] Mandamus relief is ordinarily a sufficient process for review of quasi-legislative exercise of power. It does not appear to be sufficient for review of exercises of quasi-judicial power.

county or state, if he is empowered to act in those multitudinous cases involving business or political dealings between individuals and the public, wherein the latter must necessarily act through an official agency, then such functions are a part of the sovereignty of the state."

Under R. C. 127.14(B), the Controlling Board does not exercise some portion of the sovereign power. The board is concerned with the internal operation of the budgeting and appropriating process under this section. The fact that legislators serve on the board is not violative of Section 4 of Article II.

Relator's contention that the actions of the board were a nullity because of the appointment of members of the General Assembly to the board under R. C. 127.12 is based on Section 27 of Article II, which states:

"The election and appointment of all officers, and the filling of all vacancies, not otherwise provided for by this constitution, or the constitution of the United States, shall be made in such manner as may be directed by law; but no appointing power shall be exercised by the General Assembly, except as prescribed in this constitution; and in these cases, the vote shall be taken 'viva voce.' "

R. C. 127.12 states, in part:

"There is hereby created a controlling board consisting of the director of budget and management or an employee of the office of budget and management designated by the director, the chairman of the finance-appropriations committee of the house of representatives, the chairman of the finance committee of the senate, two members of the house of representatives appointed by the speaker, one from the majority party and one from the minority party, and two members of the senate appointed by the president, one from the majority party and one from the minority party."

We construe the limitation in Section 27 to apply to public offices. As delineated above, a position on the Controlling Board does not constitute a public office. Consequently, R. C. 127.12 is not violative of Section 27 of Article II.

R. C. 127.13 reads, in part:

"The director of budget and management or his designee shall be president of the controlling board. The president shall

prepare the proposed agenda for the meetings of the board and shall provide, at least seven days prior to the meeting, copies of the proposed agenda and supporting documentation to the members of the board, to each state agency having a request on the proposed agenda, and to the legislative budget office."

Ordinarily, the Controlling Board must give the seven-day notice. However, the General Assembly indicated in this section awareness through the use of the phrase "proposed agenda" that in some circumstances notice is not practical. Clearly a proposed agenda can be altered. Thus the board is allowed, where an exigency exists, to make a decision without providing such notice.

In the case at bar, the Controlling Board attempted to waive the notice requirement by the consent of the board members. Although this attempted waiver was ineffective (ORTA being an agency having a request on the proposed agenda), relator does not challenge the determination that an emergency situation existed. In addition, relator admits that ORTA members were aware of the meeting prior to January 26, 1981. As a result, the action of the board was not nullified by its failure to give notice.

Thus, we are left with the issue of whether the Controlling Board's transfer of funds on January 26, 1981, was contrary to the legislative intent of the General Assembly regarding program goals and levels of support for ORTA. If it was, the board's action would be violative of R. C. 127.17.

Because the extraordinary writ of mandamus is involved, the board's action must be clearly contrary to the legislative intent or a writ will not be granted.

In the case at bar, $932,704 of the $1,288,245 transferred from fiscal year 1981 to fiscal year 1980 can be attributed to appropriations for fiscal year 1980 which had been transferred forward by the board on June 30, 1980. By appropriating the money for fiscal year 1980, the General Assembly indicated an intent to spend that money in that fiscal year. Although, due to program goals, it may have been lawful to transfer that money forward, the board's reconsideration of that decision and transfer back were not clearly contrary to the legislative intent. Consequently, we refuse to grant a writ ordering the

certification of the availability of the $932,704 from the fiscal year 1980.

On the other hand, the transfer of the remainder of the $1,288,245, being $355,541, was clearly contrary to intended program goals and levels of support. That money was appropriated for 1981 and was intended to be used for the high speed rail program. It could not be used for that program after it was transferred.

In the concurring opinion in *Bd. of Education* v. *Gilligan* (1973), 36 Ohio App. 2d 15, affirmed 38 Ohio St. 2d 107, the powers of the Controlling Board, which were then incorporated in the appropriations bill, were discussed. That opinion, at page 27, stated:

"***the controlling board had not, by the terms of such acts, been granted authority to cut back the level of support for state programs including education. The following language is to be found in the interim appropriation bill for August 1971: 'The Board shall take no action which does not carry out the intent of the general assembly as to program goals and levels of support of state agencies.' "

In the case at bar, the Controlling Board, in effect, deappropriated the money. Because there is no express legislative intent to allow such action, the transfer of the $355,541 must be considered a nullity.

We find that $355,541 of the transferred money was available in ORTA's account number 403 following the board's action on January 26, 1981. Wilkins and Keip were under ministerial duties to certify the availability of this sum in addition to any amount in account number 403 which might not have been transferred from fiscal year 1981 to fiscal year 1980.

Therefore, we order that a writ of mandamus issue compelling Wilkins and Keip to certify the availability of funds remaining in account number 403 for the fiscal year 1981.

*Writ allowed in part and denied in part.*

W. BROWN, SWEENEY and LOCHER, JJ., concur.

HOLMES, J., concurs in part and dissents in part.

C. BROWN, J., concurs in part and dissents in part.

P. BROWN, J., dissents.

HOLMES, J., concurring in part and dissenting in part.

I concur in that portion of the majority opinion which holds the Controlling Board a constitutional entity of the General Assembly, and also concur in the majority judgment that the General Assembly's delegation of authority to the Controlling Board to transfer funds from one fiscal year to another is constitutional. However, I would deny the writ of mandamus.

A writ of mandamus is an extraordinary remedy. Mandamus is always discretionary with the court. Even "where a petition stating a proper cause of action in mandamus is filed originally in this court, invoking its jurisdiction, and there is no plain and adequate remedy in the ordinary course of the law and the mandamus action is heard on its merits, the relator is not entitled to the allowance of the writ as a matter of right; '***mandamus is not a writ of right and its allowance or refusal is a matter of discretion with the court before whom the application for the writ is heard.' 55 Corpus Juris Secundum 25, Section 9a." *State, ex rel. Pressley,* v. *Indus. Comm.* (1967), 11 Ohio St. 2d 141, 160.

There are a number of reasons why, in the instant cause, this court should, in the proper exercise of its discretion, deny the writ.

First, it is axiomatic that a court will not interfere with the legislative function. The state Controlling Board is a legislative agency. See R. C. 127.12 *et seq.* Six of its seven members are members of the General Assembly. It would be improvident and unwise for this court, or any court, to determine if the legislative agency is acting pursuant to its legislatively delegated authority. Clearly, if the General Assembly disapproved of the Controlling Board's action, it could order the board to replace the funds in the account. The General Assembly has unlimited right to terminate, recall, or abridge the delegated power of the Controlling Board if it so desires.

Second, the writ should be denied in this case because it involves a judgment call on state program goals and level of financial support therefor. As stated in the dissent of Justice Paul W. Brown, the General Assembly itself is in an infinitely better position than this court to decide the question of the program goals and levels of support for such programs. Parenthetically, I think it reasonable to add that this point is par-

ticularly well taken in difficult, if not perilous, economic periods for this state, which we are currently experiencing.

The remedy that relator seeks lies within the legislative scheme. Relator is a member of the General Assembly. He, or other interested legislators, can introduce a bill into the General Assembly requiring the Controlling Board to reappropriate said funds. The Controlling Board would be bound by the enactment of such bill.

I, therefore, dissent from the majority's determination that it was unlawful for the Controlling Board to transfer funds previously appropriated for 1981 back to fiscal 1980, and would accordingly deny the writ.

CLIFFORD F. BROWN, J., concurring in part and dissenting in part.

I have no difficulty in concurring with the majority that R. C. 127.14(B) constitutionally authorizes the Controlling Board to transfer funds from one fiscal year (FY) to another, and that R. C. 127.12, in detailing the manner of creating the Controlling Board, does not violate Section 27, Article II of the Ohio Constitution.

At issue is the legality of transfer of $1,288,245 by the Controlling Board on January 26, 1981, from ORTA's account No. 403 for FY 1981 to FY 1980. Of this total, $932,704 was attributable to FY 1980 appropriations by the General Assembly transferred forward by valid action of the Controlling Board on June 30, 1980. The balance, $355,541, consisted of unexpended appropriations for FY 1981.

Section 22, Article II of the Ohio Constitution, gives the General Assembly absolute power to appropriate funds:

"No money shall be drawn from the treasury, except in pursuance of a specific appropriation, made by law; and no appropriation shall be made for a longer period than two years."

The action of the Controlling Board on January 26, 1981, in its transfer of funds back to FY 1980 violated this constitutional grant of power to the General Assembly.

In my view the relator is entitled to mandamus relief compelling respondents Wilkins and Keip to certify the availability of funds for whatever amount remained in the ORTA account

No. 403 on January 26, 1981, *i.e.*, $1,288,245. I reach this conclusion relying on the only statutes relevant and applicable to this question, R. C. 127.14(B) [4] and 127.17. [5] These two statutes, read together, authorize transfers of appropriations from one fiscal year to another only when consistent with the legislative intent expressed in the affected program's goals and levels of support.

The action of the Controlling Board transferring FY 1981 funds back to FY 1980 effectively thwarts the legislative intent expressed in the program's goal to provide a high speed rail program under the authority of ORTA. To conclude the General Assembly had separate program goals and a different legislative intent for each of the two fiscal years rejects both reality and the stark facts.

When the General Assembly by Am. Sub. H. B. No. 204 appropriated $550,000 for FY 1981 for ORTA, it also appropriated $1,127,812 for FY 1980. This constituted one unified program goal and level of support, within the meaning of R. C. 127.17, evidencing a single legislative intent to fund a high speed rail program. [6]

---

[4] R. C. 127.14 provides, in pertinent part:

"The controlling board may, at the request of any state agency or the director of budget and management, authorize with respect to the provisions of any appropriation act:

"****

"(B) Transfers of all or part of an appropriation from one fiscal year to another."

[5] R. C. 127.17 provides:

"The controlling board shall take no action which does not carry out the legislative intent of the general assembly regarding program goals and levels of support of state agencies as expressed in the prevailing appropriations acts of the general assembly."

[6] The conclusion I reach is based upon a simple syllogism. It is as follows:

A single legislative act appropriating funds for two fiscal years is one which establishes a specific legislative intent regarding program goals and levels of support for *two* fiscal years, but for a *single* purpose. (R. C. 127.17.)

A law which establishes a specific legislative intent regarding program goals and levels of support for two fiscal years for a single purpose is a law which must be enforced by the courts as a unitary whole, so that all funds for both fiscal years are used for that single purpose, level of support and program goal.

Therefore, the single legislative act, Am. Sub. H. B. No. 204, which appropriated to ORTA funds for two fiscal years, is a law which must be enforced by the courts as a unitary whole, so that all funds for both fiscal years are used for that single purpose, level of support and program goal, intended by the legislature.

A logical interpretation of R. C. 127.14(B) is that the Controlling Board may make transfers from one fiscal year to a future year, *e.g.,* from FY 1980 to FY 1981, but not from a present fiscal year to a past one, *e.g.,* FY 1981 to FY 1980. Application of rules of statutory construction mandate such result. See R. C. 1.47 and 1.49. Also, the purpose of the power to transfer funds is to protect and salvage funds in danger of lapsing at the end of the first year of a biennial budget by moving them into the second year.[7] The transfer forward by the Controlling Board on June 30, 1980, of the fund balance from FY 1980 to FY 1981 was valid under R. C. 127.14(B). The transfer back on January 26, 1981, however, contravenes the logical meaning of R. C. 127.14(B), as well as interfering with the expressed legislative intent, in violation of R. C. 127.17. For these reasons, transfer of any funds back to FY 1980 was illegal.

Therefore, it is my view that a writ of mandamus should

---

In this case, the single appropriation to ORTA for two fiscal years would primarily be used to fulfill the contract awarded to Dalton, Dalton, Newport, Inc., on January 7, 1981, providing for payment of approximately $1,200,000 to Dalton.

Shifting funds back to FY 1980, as the Controlling Board did in this case, collides with the "program goals and levels of support * * * expressed * * * [by] the general assembly," in Am. Sub. H. B. No. 204, in clear violation of R. C. 127.17.

[7] By sanctioning the manipulation of funds accomplished January 26, 1981, we allow the Controlling Board the power to render impotent every agency and department of state government relying on biennial funding. The Controlling Board can merely wait until the commencement of the second year of the biennium, then transfer backward to the first year all remaining unexpended funds, thereby causing them to lapse. It can also cause legislative chaos.

In a comparable situation, *Bd. of Education* v. *Gilligan* (1973), 36 Ohio App. 2d 15, affirmed 38 Ohio St. 2d 107, Governor Gilligan used his budget cutting authority pursuant to R. C. 126.08. The Court of Appeals for Franklin County held the Governor had no authority to cut the school foundation program by three percent for a two-month period. In concurring, Judge (now Justice) Holmes aptly stated that the Controlling Board lacked power to cut back levels of support for state programs, using the following language, at page 27:

"However, even the Controlling Board had not, by the terms of such acts, been granted the authority to cut back the level of support for state programs including education. The following language is to be found in the interim appropriation bill for August, 1971: 'The Board shall take no action which does not carry out the intent of the general assembly as to program goals and levels of support of state agencies.' " That language is now found in R. C. 127.17.

*Bd. of Education* v. *Gilligan* and the views expressed therein by Justice Holmes are inconsistent with the decision of this court today.

issue compelling respondents Wilkins and Keip to certify the availability of $1,288,245 in account No. 403 for the fiscal year 1981.

Instead of "infringing upon the power of the legislature to oversee its own affairs," as expressed in Justice Paul Brown's dissent, a writ of mandamus compelling certification of the funds, would prevent the Controlling Board from illegally infringing upon the power of the General Assembly to oversee its own affairs.

PAUL W. BROWN, J., dissenting.   While I express no opinion as to either the General Assembly's wisdom in making the initial appropriation to ORTA, or the Controlling Board's action thereon, I must register my disagreement with the majority's decision herein.

By Constitution, the people of Ohio have divided the powers of government of this state into three equal, coordinate departments—legislative, executive and judicial.[8] The decision reached today by the majority serves to blur the distinction between the functions performed by, and the powers vested in, these separate and equal branches of the state government. It represents an impermissible judicial foray into the province of the General Assembly.

In the case at bar, we are not dealing with an issue of constitutional magnitude which would, perforce, require this court to exercise its jurisdiction. Rather, as stated by the majority, this court is called upon to ascertain the "legislative intent of the General Assembly regarding program goals and levels of support for ORTA." The General Assembly, itself, is in an infinitely better position than this court to decide that question.

Stripped of its veneer, the instant action represents an attempt to have this court substitute its will for a policy decision reached by a duly appointed and functioning arm of the General Assembly—the Controlling Board. The action taken by the Controlling Board being correct both in form and law, this court should have declined to exercise jurisdiction in the matter. "Courts exist solely to declare and enforce the law, and are without authority as to matters of *mere governmental*

---

[8] Articles II, III, and IV of the Ohio Constitution.

*policy.* Hence, all personal or political maneuvering, which complies with the law, in substance as well as in form, is beyond the authority of the courts to control. Thus if, because of either personal or political motives, officials fail to take the course of action best suited to the public interest, but take a course less beneficial to the public, yet, if the action taken was both in fact and in form in accord with the law, the remedy available to the citizens for the failure to take the best course lies, not with the courts, but at the polls." *Grogan* v. *DeSapio* (1951), 15 N.J. Super. 604, 83 A. 2d 809, at 611-612. (Emphasis added.)

The majority does not contemn the constitutionality of the statute creating the Controlling Board. Instead, it holds that the Controlling Board may not exercise the power expressly granted to it by the General Assembly. The majority's decision places this court squarely in the appropriation process, for, by its decision, the majority holds that this court may displace the considered judgment of the Controlling Board — a body directly responsible to, and directly under the control of, the General Assembly. As has been said, "***appropriations represent an exercise of legislative judgment. As such, they constitute a purely political decision and an exercise of governmental discretion." *Borough of Glassboro* v. *Byrne* (1976), 141 N.J. Super. 19, 357 A. 2d 65, at 24. While the decisions of the Controlling Board may be more than advisory opinions, the fact remains that no action taken by the Controlling Board can withstand a direct legislative mandate to the contrary. The General Assembly, as a body, clearly is empowered to reverse any decision of the Controlling Board. Thus, the instant case represents an unjustifiable attempt to circumvent the legislative process. "Any legal action that has as its end the circumscription of the legislative power*** [should be] viewed charily by this court. ***a '[w]ide berth***[should be] given to administrative decisions of a legislative character.' This is the expression of a fundamental principle of constitutional law." *Outagamie County* v. *Smith* (1968), 38 Wis. 2d 24, 155 N.W. 2d 639, at 37. (Citations omitted.)

Our government is premised upon the principle of the separation of powers into three equal branches. This court has jealously and properly guarded against all attempts by the

other branches to unlawfully supervise or police the powers of the judiciary. Yet, by its action today, this court is, in fact, infringing upon the power of the legislature to oversee its own affairs. "For any one of***[the branches of government] to police or supervise the others strikes at the very heart and core of the entire structure. Abuses within the reserved sphere of any of these branches of government may arise, but that fact does not give license to one of the other co-ordinate branches to correct. Correction comes from within that branch itself or from the people to whom all public officers are responsible for their acts." *Renck* v. *Superior Court of Maricopa County* (1947), 66 Ariz. 320, 187 P. 2d 656, at 326.

" 'All political power is inherent in the people, and governments derive their just powers from the consent of the governed. This is not a mere metaphor, that sounds pleasing to the ear, nor is it a maxim that may not have a concrete application; but it is a vital principle, adhered to in the formation of the government of this state.' " *Id.* (Citation omitted.)

I believe that the question presented is, in fact, one that requires this court to supervise and police the internal functioning and decision making processes of the General Assembly.[9] As such, it represents a political question which is not justiciable in this court. For the foregoing reasons, I would dismiss for lack of jurisdiction.

---

[9] This action seeks a certificate of availability of $1,200,000, for the contract in question. The majority decision leaves only $355,541 for this purpose. Thus, if the majority is correct in its conclusion that the Controlling Board has thwarted the program goals set by the General Assembly, this court has in effect denied relief, leaving the relator with no option except legislative action in a future budget.