[This decision has been published in *Ohio Official Reports* at 96 Ohio St.3d 250.]

D.A.B.E., INC., D.B.A. ARNIE'S SALOON, ET AL., RESPONDENTS, *v*. TOLEDO-LUCAS COUNTY BD. OF HEALTH ET AL., PETITIONERS.

[Cite as *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health,* 2002-Ohio-4172.]

*Public health—Health districts—General Assembly has not indicated any intent through R.C. 3709.21, or otherwise, to vest local boards of health with unlimited authority to adopt regulations addressing all public-health concerns—Administrative regulations cannot dictate public policy but can only develop and administer policy already established by the General Assembly—R.C. 3709.21 is a rules-enabling statute, not a provision granting substantive regulatory authority.*

(No. 2001-1407—Submitted April 9, 2002—Decided August 28, 2002.)

ON ORDER from the United States District Court, Northern District of Ohio, Western Division, Certifying Questions of State Law, No. 3:01-CV-7334.

———————————

SYLLABUS OF THE COURT

1. The General Assembly has not indicated any intent through R.C. 3709.21, or otherwise, to vest local boards of health with unlimited authority to adopt regulations addressing all public-health concerns.

2. Administrative regulations cannot dictate public policy but rather can only develop and administer policy already established by the General Assembly.

3. R.C. 3709.21 is a rules-enabling statute, not a provision granting substantive regulatory authority.

———————————

**DOUGLAS, J.**

{¶1} This matter is before the court on four certified questions of state law from the United States District Court, Northern District of Ohio, Western Division. The defendants before the district court and designated petitioners in this court are the Board of Health of the Lucas County Regional Health District and the Lucas County Regional Health District itself.[1] The Lucas County Regional Health District is a general health district organized pursuant to R.C. 3709.07. The district covers all of Lucas County, including the city of Toledo, and is headed by an eleven-member board of health. Each member of the board is appointed by one of the political subdivisions comprised by the district. The plaintiffs in the action before the district court are the designated respondents before this court. They are 27 small business owners and trade associations in Lucas County, Ohio. Respondents are a diverse group that includes owners of bars, restaurants, a bowling alley, and a cigar lounge. The underlying action pending before the federal district court involves respondents' challenge to a regulation adopted by the board prohibiting smoking in all enclosed, indoor areas in Lucas County where members of the general public gather—including bars, restaurants, and bowling alleys—as well as in all places of employment and vehicles of public transportation. In its certification order, the district court set forth the following procedural facts and history:

{¶2} "On May 24, 2001, the Board adopted a regulation entitled the 'Lucas County Regional Health District Clean Indoor Air Regulation' ('the Regulation'). The Board cited the health concerns from 'second hand smoke' and Section 3709.21 of the *Ohio Revised Code* as authority for passing the Regulation. The

---

1. Upon certification, the petitioners were identified as the Toledo-Lucas County Board of Health, the Toledo-Lucas County Health Department, and the Lucas County Regional Health District. The petitioners have explained that although the district does use these names, the proper designation of petitioners is as we have set forth herein.

Regulation prohibits smoking in all Public Areas, which are defined as every enclosed, indoor area to which members of the general public are invited or in which members of the general public are normally permitted. Thus, the Regulation prohibits smoking in bars, restaurants, tobacco shops, bowling alleys, all public areas of places of employment—in almost every indoor place in Lucas County, Ohio other than private residences, private cars and private clubs. The Regulation also prohibits smoking within twenty feet of any entrance or open window of these Public Areas and in all Vehicles of Public Transportation. The Regulation provides for the criminal penalties prescribed in Section 3709.99 of the *Ohio Revised Code,* for both the individual who violates the Regulation, as well as the owner of any Public Area that does not enforce the Regulation within the Public Area under his or her control. By its terms, the Regulation was to go into effect on July 8, 2001.

{¶3} "On June 28, 2001, twenty-seven Plaintiffs, a group consisting of owners of bars, restaurants, a cigar lounge, a bowling alley, and other establishments where many patrons smoke and where patrons expect smoking, filed a Complaint in Lucas County Common Pleas Court under the Ohio Declaratory Judgment Act, seeking a declaration that the Regulation is invalid. Plaintiffs asserted five claims based on Ohio state law (essentially alleging that the Regulation was beyond the Board's legislative authority under Chapters 3707 and 3709 and related provisions of the Ohio Revised Code, that the Regulation constituted an illegal legislative act, and that the Regulation is unlawful and unreasonable as applied) and a single federal law claim that the Regulation was an unconstitutional taking. On the same day, Defendants removed this action to this court, the United States District Court for the Northern District of Ohio, Western Division, based on the federal claim.

{¶4} "On July 5, 2001, Plaintiffs moved for a temporary restraining order/preliminary injunction. After a full hearing and submission of briefs, this Court granted Plaintiffs a preliminary injunction, enjoining Defendants from

enforcing the Regulation until Plaintiffs' claims could be determined on their merits.  In the July 6, 2001 Memorandum Opinion, this Court noted that it was of the opinion that the public interest would best be served by retaining jurisdiction over this case and certifying central questions of Ohio law to the Ohio Supreme Court."

{¶5} The federal district court has certified to us, and we have agreed to answer, the following questions of state law:

{¶6} 1. Does the *Ohio Revised Code* authorize or delegate to a local board of health of a general health district the authority to prohibit smoking in all public places as defined by the Regulation at issue herein?

{¶7} 2. If the answer to Question 1 is yes, does such a delegation of authority violate the Ohio Constitution?

{¶8} 3. Does a regulation adopted by a board of health of a general health district, which prohibits smoking in all public places as defined by the Regulation at issue, conflict with, or is it inconsistent with or preempted by the provisions of the *Ohio Revised Code* that already govern the conduct of smoking in places of public accommodation and elsewhere?

{¶9} 4. To the extent a regulation which prohibits smoking in all public places as defined by the Regulation at issue conflicts with a municipal ordinance regulating the same area, which one prevails pursuant to Section 3, Article XVIII of the Ohio Constitution (relating to home-rule)?

{¶10} With respect to these questions, the district court issued the following findings:

{¶11} "The Ohio Supreme Court has never specifically addressed the issue of whether a board of health of a general health district has the authority to prohibit smoking in all enclosed, indoor public areas pursuant to Section 3709.21 of the *Ohio Revised Code*.  It appears that only three Ohio trial courts have ruled on this issue.  *Brewery, Inc. v. Delaware City-County Bd. of Health* (July 19, 1999),

Delaware C.P. No. 98-CVH-12-413, unreported; *Wilson v. Knox Cty. Bd. of Health* (January 11, 1986), Knox C.P. No. 95IN050086, unreported; *Cookie's Diner v. Columbus Bd. of Health* (Franklin Cty. Muni.1994), 65 Ohio Misc.[2d] 65 [640 N.E.2d 1231].

{¶12} "Also of relevance to the issues certified are various statutes regulating smoking in the State of Ohio. Among others, the most broad of these sections is Section 3791.031 of the *Ohio Revised Code,* which provides for 'nonsmoking areas in places of public assembly.' In R.C. 3791.031, the General Assembly specifically delegated authority to designate nonsmoking sections in places of public assembly to the local fire authority, the director of administrative services of a state agency, or the person controlling the place of public assembly, depending on the type of place to be regulated.

{¶13} "Finally, Chapter 1779 of the Toledo Municipal Code, which was enacted by Toledo's city council in 1987, regulates smoking within the city and allows smoking to some degree in Plaintiffs' businesses." (Footnote omitted.)

Question 1

{¶14} "Does the *Ohio Revised Code* authorize or delegate to a local board of health of a general health district the authority to prohibit smoking in all public places as defined by the Regulation at issue herein?"

{¶15} The district and the board, hereinafter "petitioners," argue that R.C. 3709.21 vests a local board of health of a general health district with a broad grant of authority to adopt regulations necessary to protect the public health. Petitioners contend that R.C. 3709.21 is a separate, independent, and complete grant of authority to address threats to the public health, whatever they may be and whenever they may arise. In petitioners' view, as long as a local health board adopted a regulation pursuant to R.C. 3709.21, and the regulation was necessary to protect the public health, reasonable, nondiscriminatory, and consistent with constitutional guarantees, the regulation would be valid and enforceable. Thus,

petitioners urge us to find that they have acted within the scope of their authority in adopting the Clean Indoor Air Regulation.

{¶16} Respondents, on the other hand, contend that the General Assembly has not delegated to local boards of health the power to adopt any type of smoking ban. Respondents argue that R.C. 3709.21 is merely an enabling statute intended solely to confer rule-making powers on boards of health rather than a statute that grants substantive and plenary authority to local boards to regulate all public health concerns.

{¶17} R.C. 3709.21 provides:

{¶18} "The board of health of a general health district may make such orders and regulations as are necessary for its own government, for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances. Such board may require that no human, animal, or household wastes from sanitary installations within the district be discharged into a storm sewer, open ditch, or watercourse without a permit therefor having been secured from the board under such terms as the board requires. All orders and regulations not for the government of the board, but intended for the general public, shall be adopted, recorded, and certified as are ordinances of municipal corporations and the record thereof shall be given in all courts the same effect as is given such ordinances, but the advertisements of such orders and regulations shall be by publication in one newspaper published and of general circulation within the district. Publication shall be made once a week for two consecutive weeks and such orders and regulations shall take effect and be in force ten days from the date of the first publication. In cases of emergency caused by epidemics of contagious or infectious diseases, or conditions or events endangering the public health, the board may declare such orders and regulations to be emergency measures, and such orders and regulations shall become effective immediately without such advertising, recording, and certifying."

**{¶19}** As in all cases involving statutory interpretation, we are guided by several well-established rules. Petitioners focus on the words "public health" in R.C. 3709.21. But words in a statute do not exist in a vacuum. We must presume that in enacting a statute, the General Assembly intended for the entire statute to be effective. R.C. 1.47(B). Thus, all words should have effect and no part should be disregarded. In answering the first certified question, our attention should be directed beyond single phrases, and we should consider, in proper context, all words used by the General Assembly in drafting R.C. 3709.21 with a view to its place in the overall statutory scheme.

**{¶20}** In examining a statute, if the language is ambiguous, a court may consider laws upon the same or similar subjects in order to determine legislative intent. R.C. 1.49(D). "Statutes relating to the same matter or subject, although passed at different times and making no reference to each other, are *in pari materia* and should be read together to ascertain and effectuate if possible the legislative intent." *State ex rel. Pratt v. Weygandt* (1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d 191, paragraph two of the syllabus. Further, in reading such statutes and construing them together, we must arrive at a reasonable construction giving the proper force and effect, if possible, to each statute. *Maxfield v. Brooks* (1924), 110 Ohio St. 566, 144 N.E. 725, paragraph two of the syllabus. Thus, an examination of the first certified question is not complete unless we consider and construe all of R.C. Chapter 3709 together with any other relevant code sections.

**{¶21}** At first glance, the language of R.C. 3709.21 seems to grant petitioners the necessary authority to enact the regulation at issue. The first sentence of R.C. 3709.21 provides: "The board of health of a general health district may make such orders and regulations as are necessary for its own government, for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances." In construing this section we are mindful of certain statutory rules of construction set forth in the Revised Code. It is

presumed that in enacting a statute the General Assembly intended a just and reasonable result and a result feasible of execution. R.C. 1.47. In addition, R.C. 1.42 provides: "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

{¶22} However, the natural meaning of words is not always conclusive as to the construction of statutes. *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.* (1917), 95 Ohio St. 367, 373, 116 N.E. 516. While it is a long-recognized canon of statutory construction that the words and phrases used by the General Assembly will be construed in their usual, ordinary meaning, that is not so when a contrary intention of the legislature clearly appears. *S. Sur. Co. v. Std. Slag Co.* (1927), 117 Ohio St. 512, 519, 159 N.E. 559. Accordingly and for the following reasons, we find that the General Assembly has not indicated any intent through R.C. 3709.21, or otherwise, to vest local boards of health with unlimited authority to adopt regulations addressing all public-health concerns.

{¶23} Throughout R.C. Chapter 3709, and elsewhere, the General Assembly has explicitly and in great detail identified specific areas where local boards of health have substantive regulatory power to address public-health issues. While these provisions are quite numerous and some are quite extensive, a few examples will suffice for our purposes.

{¶24} R.C. 3714.12 provides that a board of health of a health district may issue orders in accordance with R.C. 3709.20 or 3709.21 to a license holder or other person to abate a violation of any section of R.C. Chapter 3714, the chapter governing construction and demolition debris, or any rule, adopted thereunder. R.C. 3709.085 allows the board of health of a city or general health district to enforce on behalf of the Environmental Protection Agency regulations for the disposal or treatment of sewage from semipublic disposal systems. R.C. 3709.22

requires boards of health of a city or general health district to promptly diagnose and control communicable diseases and gives the boards the power to inspect places where food is prepared and handled and to examine workers employed there. R.C. 3701.344 gives city or general health district boards of health the exclusive power to inspect private water systems and administer programs of a public-health council. R.C. 3730.03 requires local boards of health to regulate and approve businesses that provide tattooing and body-piercing services. R.C. 3707.01 delegates to boards of health of a city or general health district the authority to abate and remove all nuisances within its jurisdiction. R.C. 955.26 allows a city or general health district board of health to quarantine and vaccinate dogs for rabies.

{¶25} At a minimum, enactment of the provisions cited above indicates that the General Assembly did not intend through R.C. 3709.21 to vest local boards of health with plenary authority to adopt any regulations that they deem necessary for the public health. If petitioners correctly construe R.C. 3709.21 as authorizing such regulatory authority, then entire sections of R.C. Title 37, as well as other provisions, would be rendered superfluous.

{¶26} A basic rule of statutory construction requires that "words in statutes should not be construed to be redundant, nor should any words be ignored." *E. Ohio Gas Co. v. Pub. Util. Comm.* (1988), 39 Ohio St.3d 295, 299, 530 N.E.2d 875. Statutory language "must be construed as a whole and given such interpretation as will give effect to every word and clause in it. No part should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative." *State ex rel. Myers,* 95 Ohio St. at 372-373, 116 N.E. 516.

{¶27} In *Johnson's Markets, Inc. v. New Carlisle Dept. of Health* (1991), 58 Ohio St.3d 28, 567 N.E.2d 1018, this court considered whether local boards of health had been granted any regulatory authority over establishments where food is manufactured, handled, or sold or whether the Ohio Department of Agriculture had

exclusive authority over such areas. We held: "The Ohio Department of Agriculture does not have exclusive authority to regulate the sanitary conditions of food establishments. Local boards of health may also statutorily prescribe some sanitary regulations for food establishments." Id. at syllabus.

{¶28} *Johnson's Markets* involved the New Carlisle Department of Health, a board of health of a city health district as defined by R.C. 3709.20, which contains language substantially identical to R.C. 3709.21. In arriving at our decision in *Johnson's Markets,* we construed, in pari materia, several related sections of the Revised Code, namely R.C. 3709.20, 3709.22, 913.41, and 913.42. In reviewing all of the Revised Code sections applicable therein, we concluded that R.C. 3709.20 gave city health districts authority to " 'make such orders and regulations as are necessary for [their] own government, for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances.' *Also, in order to facilitate such rule-making powers, the General Assembly empowered city health districts by way of R.C. 3709.22* to inspect places 'where food is manufactured, handled, stored, sold, or offered for sale      * * *.' " (Emphasis added.) *Johnson's Markets,* 58 Ohio St.3d at 36, 567 N.E.2d 1018.

{¶29} Petitioners suggest that *Johnson's Markets* is consistent with its position that the authority granted to local boards of health through R.C. 3709.21 is very broad in scope and plenary. The language emphasized above clearly does not support this contention. Had the court interpreted R.C. 3709.20 in the same manner that petitioners urge us to construe R.C. 3709.21, the court's reference to R.C. 3709.22, the section authorizing the board to inspect food establishments, would have been unnecessary. We believe, instead, that the court's construction of R.C. 3709.20 and 3709.22, after we construe those provisions and others in pari materia, strengthens rather than weakens the argument that specific statutory authorization, beyond the general power set forth in R.C. 3709.21, is required before a local board of health can regulate in a certain area.

**{¶30}** Furthermore, we disagree with petitioners' reliance on paragraphs one and two of the syllabus of *Weber v. Butler Cty. Bd. of Health* (1947), 148 Ohio St. 389, 35 O.O. 351, 74 N.E.2d 331, in regard to the first certified question. Petitioners contend that *Weber* stands for the proposition that R.C. 3709.21 contains a legislative mandate that boards of health have broad authority and wide latitude to make regulations necessary to protect the public health, regardless of the nature of the harm.

**{¶31}** *Weber* concerned G.C. 1261-42, the substantially similar precursor to R.C. 3709.21. 108 Ohio Laws, Part I, 246. In paragraphs one and two of the syllabus in *Weber,* the court found G.C. 1261-42 to be a valid and constitutional enactment. The court found that G.C. 1261-42, despite lacking any standards for guidance from the General Assembly, was constitutional because it was a police regulation necessary for the protection of the public health and that adopting specific standards for guidance would defeat the legislative objective sought to be accomplished. *Weber* at paragraphs one and two of the syllabus.

**{¶32}** We do not dispute that R.C. 3709.21 is a valid and constitutional enactment. However, our concern under the first certified question is not the constitutionality of R.C. 3709.21. Our concern is whether *any* section of the Revised Code authorizes a local board of health to adopt regulations that prohibit smoking in public places. In any event, we do not view *Weber* as interpreting G.C. 1261-42 to confer the level of regulatory authority that petitioners contend R.C. 3709.21 does.

**{¶33}** The issue in *Weber* was whether the board of health of a general health district had the authority to adopt a resolution with regard to the transportation of garbage in Butler County and the regulation of hog pens and piggeries. Although the court concluded that the resolution was infirm on other grounds, it also found that G.C. 1261-42 did authorize the local board of health to regulate the transportation and use of garbage for animal feeding because such

practices tended to create nuisances. However, while not cited in the majority opinion, there was separate statutory authority that gave local boards of health the power to abate nuisances and adopt sanitary controls. *Weber,* 148 Ohio St. at 403, 35 O.O. 351, 74 N.E.2d 331 (Zimmerman, J., dissenting). G.C. 1261-26 stated: "The district board of health may also provide for the inspection and abatement of nuisances dangerous to public health or comfort, and may take such steps as are necessary to protect the public health and to prevent disease." 108 Ohio Laws, Part II, 1088, predecessor of R.C. 3709.22. In addition, G.C. 4420 required the board of health of a municipality to abate all nuisances within its jurisdiction. Furthermore, G.C. 4421 authorized boards of health to "regulate the location, construction and repair of yards, pens and stables, and the use, emptying and cleaning thereof." See now R.C. 3707.01. There are no such statutory provisions that could be construed as authorizing petitioners to enact the regulation at issue herein.

{¶34} For similar reasons, petitioners' reliance on *DeMoise v. Dowell* (1984), 10 Ohio St.3d 92, 10 OBR 421, 461 N.E.2d 1286, is unfounded. Contrary to petitioners' assertion, in *DeMoise* local boards of health were given a specific delegation of power by the General Assembly to regulate in the subject matter area of sanitary sewerage systems. Id. at 94-95, 10 OBR 421, 461 N.E.2d 1286.

{¶35} Petitioners also rely on *Schlenker v. Auglaize Cty. Gen. Bd. of Health Dist.* (1960), 171 Ohio St. 23, 12 O.O.2d 42, 167 N.E.2d 920. In upholding the regulation in *Schlenker,* the court noted that no statute explicitly authorized the board of health to regulate pasteurization of milk. However, the court in *Schlenker* did not rely solely on R.C. 3709.21 in finding that the regulation therein was a proper exercise of the police powers of the local board of health.

{¶36} The *Schlenker* court specifically cited R.C. 3709.22 as allowing boards of health to take "such steps as are necessary to protect the public health and to prevent disease." *Schlenker,* 171 Ohio St. at 25, 12 O.O.2d 42, 167 N.E.2d 920.

Furthermore, although this language was not reflected in the majority opinion, R.C. 3709.22 additionally authorized the board to "provide for the inspection of dairies * * * and other places where food is manufactured, handled, stored, sold, or offered for sale," and required the board to "study and record the prevalence of disease within the district and provide for the prompt diagnosis and control of communicable diseases." In addition, as was the case with *Weber,* there were other specific grants of statutory authority to the board to regulate that specific area. See former R.C. 3707.34, 1953 H.B. No. 1 (allowing board of health to regulate the sale of milk and to revoke a seller's permit if milk is kept in an "unsanitary condition"), and R.C. 3707.04 through 3707.32 (general regulation of communicable diseases). Thus, in each case discussed above, statutes other than R.C. 3709.21 authorized the regulatory action taken by the local boards of health.

{¶37} In paragraph three of the syllabus in *Weber,* the court held that "the board of health of a general health district has a wide latitude in making and enforcing rules and regulations for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisance, but when such board passes a resolution which prohibits a business not unlawful in itself and which is susceptible to regulations which will prevent it from becoming either a health menace or a nuisance, such board transcends its administrative rule-making power and exercises legislative functions in violation of Section 1 of Article II of the Constitution of Ohio." *Weber,* 148 Ohio St. 389, 35 O.O. 351, 74 N.E.2d 331.

{¶38} It is well settled that an administrative agency has only such regulatory power as is delegated to it by the General Assembly. Authority that is conferred by the General Assembly cannot be extended by the administrative agency. *Burger Brewing Co. v. Thomas* (1975), 42 Ohio St.2d 377, 379, 71 O.O.2d 366, 329 N.E.2d 693.

{¶39} "Such grant of power, by virtue of a statute, may be either express or implied, but the limitation put upon the implied power is that it is only such as may

be reasonably necessary to make the express power effective. In short, the implied power is only incidental or ancillary to an express power, and, if there be no express grant, if follows, as a matter of course, that there can be no implied grant.

{¶40} "In construing such grant of power, particularly administrative power through and by a legislative body, the rules are well settled that the intention of the grant of power, as well as the extent of the grant, must be clear; that in case of doubt that doubt is to be resolved not in favor of the grant but against it." *State ex rel. A. Bentley & Sons Co. v. Pierce* (1917), 96 Ohio St. 44, 47, 117 N.E. 6.

{¶41} There is no express grant of power in R.C. 3709.21, or elsewhere, allowing local boards of health unfettered authority to promulgate any health regulation deemed necessary. Since there is no express delegation, it follows that there is no implied authority for petitioners to adopt the smoking ban at issue. Administrative regulations cannot dictate public policy but rather can only develop and administer policy already established by the General Assembly. *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 567, 697 N.E.2d 198. In promulgating the Clean Indoor Air Regulation, petitioners engaged in policy-making requiring a balancing of social, political, economic, and privacy concerns. Such concerns are legislative in nature, and by engaging in such actions, petitioners have gone beyond administrative rule-making and usurped power delegated to the General Assembly.

{¶42} Finally, we address petitioners' assertion that ruling in favor of respondents would limit the broad powers conferred by R.C. 3709.21 on local boards of health to adopt public-health regulations and would constrain if not eviscerate their ability to respond effectively to new public-health threats as they arise. We find that petitioners' concerns are not well founded.

{¶43} Petitioners contend that the very purpose for which R.C. 3709.21 was enacted was "to vest boards of health with broad authority to expeditiously and effectively address any health threat that arises, whether previously addressed by

14

specific statute or not." In support, petitioners rely on the decision by the Franklin County Municipal Court in *Cookie's Diner, Inc. v. Columbus Bd. of Health* (1994), 65 Ohio Misc.2d 65, 640 N.E.2d 1231. Although striking the regulation on other grounds, the municipal court in *Cookie's Diner* did conclude that the Revised Code authorized local boards of health to regulate smoking. Central to the court's determination was that local boards of health need the ability to respond quickly, without awaiting authority from the General Assembly, to address any newly discovered health hazards or emergencies. The court reasoned: "If the General Assembly had intended to restrict the boards' permitted area of regulations to specifically named matters, and only those matters, the General Assembly could have done so. It chose not to. It chose not to, because in the words of *Weber* [148 Ohio St. at 396, 35 O.O. 351, 74 N.E.2d 331], 'the nature of the problem' (the problem being the protection of the public health) is such that it is impossible to lay down precise standards to define what unheard-of or newly discovered public health hazards or diseases might be on the next horizon." *Cookie's Diner,* 65 Ohio Misc.2d at 73, 640 N.E.2d 1231. Our response to the municipal court's rationale in *Cookie's Diner,* and petitioners' reliance thereon, is twofold.

{¶44} First, R.C. 3709.21 contemplates that it may be necessary at times for local boards of health to act expeditiously to respond to any new health hazard or disease. R.C. 3709.21 provides: "In cases of emergency caused by epidemics of contagious or infectious diseases, or conditions or events endangering the public health, the board may declare such orders and regulations to be emergency measures, and such orders and regulations shall become effective immediately without such advertising, recording, and certifying." However, as respondents aptly point out, the General Assembly has elsewhere delegated, through various provisions of R.C. Chapter 3707, the authority to local boards of health to address epidemics and dangerous communicable diseases. See R.C. 3707.04 et seq.

**{¶45}** Second, we agree that the reason the General Assembly did not impose standards on local boards of health through R.C. 3709.21 was that to do so would have been impractical. See *State ex rel. Meshel v. Keip* (1981), 66 Ohio St.2d 379, 386, 20 O.O.3d 338, 423 N.E.2d 60, citing *Matz v. J.L. Curtis Cartage Co.* (1937), 132 Ohio St. 271, 8 O.O. 41, 7 N.E.2d 220. We hold, however, that R.C. 3709.21 is a rules-enabling statute, not a provision granting substantive regulatory authority. The authority conferred by R.C. 3709.21 is administrative and procedural. Without this provision, boards of health of a general health district could not function effectively, as they would be without the authority to issue orders and adopt regulations relating to the numerous areas of public health where power to act has been delegated. See *Matz,* 132 Ohio St. at 282, 8 O.O. 41, 7 N.E.2d 220.

**{¶46}** We grant that local boards of health are better situated than the General Assembly to protect the public health. That is one reason why R.C. 3709.21 does not burden local boards with restrictive guidelines or standards. Local boards need the flexibility to meet unforeseen public-health concerns and to promptly address any problems arising from previous orders and regulations. Moreover, local boards need the freedom to abate health hazards that are unique to their specific locations. However, local boards cannot act in any area of public health without prior legislative approval.

**{¶47}** Therefore, based on the foregoing reasons, we find that the language of R.C. 3709.21 that "[t]he board of health of a general health district may make such orders and regulations as are necessary * * * for the public health" does not vest local boards of health with unlimited authority to adopt regulations addressing all public-health concerns. Nor does any other section of the Revised Code delegate such authority to local boards of health. Thus, petitioners did not have the authority to adopt a regulation that would prohibit smoking in all public places in Lucas County.

**{¶48}** Accordingly, we answer the first certified question in the negative.

Questions 2, 3, and 4

**{¶49}** In view of our answer to the first certified question, certified questions two, three, and four have been obviated. Accordingly, we decline to answer them.

Conclusion

**{¶50}** Our disposition of this matter turns on issues of law and not on the deleterious effect of environmental tobacco smoke, more commonly known as secondhand smoke. We recognize, however, that there has been long-standing, national concern regarding the health effects of tobacco. Since the 1960s, when warning labels first appeared on packets of cigarettes, we have been aware of the dangers posed by tobacco use. Approximately 46 million American adults smoke cigarettes and, more alarmingly, so do an estimated 3 million adolescents under the age of 18.[2] Moreover, members of the medical and scientific communities have attributed to tobacco use various ailments such as chronic lung and heart disease, and cancers of the lung, esophagus, larynx, mouth, pancreas, kidney, bladder, and uterine cervix.[3] Both the American Cancer Society and the American Lung Association estimate that more than 400,000 Americans die each year from tobacco-related illnesses such as cancer, respiratory illnesses, and heart disease.[4]

**{¶51}** An increasing awareness of the dangers of secondhand smoke has inflamed an already fractious debate. Respondents may be correct in their assessment that these dangers are speculative. We recognize, without accepting the argument, that it can be contended that scientific determinations as to the

---

2. American Cancer Society, Cancer Prevention & Early Detection Facts & Figures 2001 (2001) 4, http://www.cancer.org/downloads/STT/CPED2002.pdf, citing Centers for Disease Control and Prevention, National Health Interview Survey (1999); Centers for Disease Control and Prevention ("CDC"), Tobacco Use in the United States, at http://www.cdc.gov/tobacco/overview/tobus_us.
3. American Cancer Society and CDC, supra, note 2.

4. American Cancer Society, supra, note 2, at 4; see, also, American Lung Association, at http://www.lungusa.org.

detrimental aspects of secondhand smoke are not conclusive and that this topic is nothing more than another politically correct trend. Nevertheless, rising incidence of tobacco-related illnesses attributed to secondhand smoke, even if not conclusively established, cannot be ignored.

**{¶52}** According to a 1986 report by the United States Surgeon General, exposure to secondhand smoke is a cause of disease, including lung cancer, in healthy nonsmokers.[5] The Surgeon General's report further found that environmental tobacco smoke was associated with an increased frequency of respiratory illnesses in young children.[6]

**{¶53}** A 1996 study conducted by the United States Department of Health and Human Services' Centers for Disease Control and Prevention ("CDC") determined that nearly nine out of ten nonsmoking Americans are exposed to secondhand smoke.[7] Secondhand smoke has been found to contain over 4,000 chemicals and 40 carcinogens.[8] The United States Environmental Protection Agency and the National Institutes of Health have classified environmental tobacco smoke as a known human carcinogen, a designation which means there is sufficient evidence that the substance causes cancer in humans.[9] The United States

---

5. United States Department of Health and Human Services. The Health Consequences of Involuntary Smoking: A Report of the Surgeon General (1986) 7, Centers for Disease Control and Prevention, http://www.cdc.gov/tobacco/sgr_1986.htm.

6. Id.
7. Centers for Disease Control and Prevention, Exposure to Secondhand Smoke Widespread, at http://www.cdc.gov/tobacco/research_data/environmental/etsrel.htm.

8. United States Environmental Protection Agency, What You Can Do About Secondhand Smoke as Parents, Decision-Makers, and Building Occupants, http://www.epa.gov/smokefree /pubs/etsbro.htm.

9. United States Environmental Protection Agency, Setting the Record Straight: Secondhand Smoke Is a Preventable Health Risk (1994) http://www.epa.gove/smokefree/pubs/strsfs.htm; see, also, Centers for Disease Control and Prevention ("CDC"), Exposure to Environmental Tobacco Smoke and Cotinine LevelsFact Sheet, at http://www.cdc.gov/tobacco/research_data /environmental/factsheet_ets.htm.

Environmental Protection Agency estimates that secondhand smoke causes approximately 3,000 lung cancer deaths in nonsmokers each year.[10] In addition, according to the United States Environmental Protection Agency and scientific studies, environmental tobacco smoke accounts for as many as 37,000 deaths from heart disease in nonsmokers each year.[11] The CDC indicates that the number of coronary-related deaths could be as high as 62,000.[12] Finally, as previously indicated, the Surgeon General, as well as other health agencies, has concluded that secondhand smoke impairs the respiratory health of thousands of young children. Studies have indicated that infants and children exposed to secondhand smoke run a higher risk of developing pneumonia, bronchitis, asthma, and middle-ear infections.[13]

{¶54} Notwithstanding, however well intentioned and beneficial the regulation adopted by petitioners may be, we refuse to extend by mere implication the authority of local boards of health beyond clearly stated and well-defined limits. To do so would require that we embrace policies and objectives that were not specifically designated by the General Assembly. Within its constitutional grant of powers, the General Assembly possesses both the authority to enact smoking

---

10. CDC, Exposure to Environmental Tobacco Smoke and Cotinine Levels—Fact Sheet, supra, note 9; American Lung Association, Fact Sheet: Secondhand Smoke and Children, September 2000, at http://www.lungusa.org/tobacco/secondkids_factsheet.htm; American Cancer Society, supra, note 2; United States Environmental Protection Agency, Setting the Record Straight: Secondhand Smoke Is a Preventable Health Risk, supra, note 9.

11. American Lung Association, Fact Sheet: Secondhand Smoke and Children, supra, note 10; CDC, Exposure to Environmental Tobacco Smoke and Cotinine Levels—Fact Sheet, supra, note 11; see, also, Stanton A. Glantz, Even a Little Secondhand Smoke Is Dangerous (2001), 286 J.Am.Med.Assn.

12. CDC, Exposure to Environmental Tobacco Smoke and Cotinine Levels—Fact Sheet, supra, note 11.
13. United States Environmental Protection Agency, Fact Sheet: Respiratory Health Effects of Passive Smoking (1993); United States Department of Health and Human Services, The Health Consequences of Involuntary Smoking: A Report of the Surgeon General (1986) 7, 10, 14, supra, note 5.

legislation such as the regulation at issue and the prerogative to delegate that authority to local boards of health. However, unless the General Assembly or a local municipality with home-rule power[14] decides otherwise, local boards of health are powerless to act as petitioners have acted herein.

{¶55} Power is not absolute. Today we recognize and follow the sage observation of that great American jurist, Louis Dembitz Brandeis. "Power must always feel the check of power." Louis D. Brandeis, quoted in Bradley, Daniels & Jones, Eds., The International Dictionary of Thoughts (1969) 573. In interpreting the laws now before us, we are constrained to find as we have.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

PFEIFER, J., dissents.

———————————

Shumaker, Loop & Kendrick, L.L.P., Louis E. Tosi, Michael A. Snyder, James O'Doherty and Thomas G. Pletz, for respondents.

Julia R. Bates, Lucas County Prosecuting Attorney, Andrew K. Ranazzi, Lance M. Keiffer, John A. Borell and Damian M.P. Rogers, Assistant Prosecuting Attorneys, for petitioners.

Zuckerman Spaeder, L.L.P., William B. Schultz and Carlos T. Angulo, in support of petitioners for amici curiae, the National Association of Local Boards of Health, the Ohio Association of Boards of Health, the Association of Ohio Health Commissioners, the Ohio Department of Health, the Ohio Environmental Health Association, the American Public Health Association, the Ohio Public Health

---

14. The home-rule authority of municipal corporations is set forth in Section 3, Article XVIII of the Ohio Constitution.

Association, the National Association of County and City Health Officials, the National Center for Tobacco-Free Kids, Americans for Nonsmokers' Rights, and the Tobacco Control Resource Center.

Danny R. Williams, Susan Jagers and Joseph L. Lanton, in support of petitioners for amici curiae, American Cancer Society, Ohio Division, Inc., American Cancer Society, American Lung Association, American Medical Association, Ohio Academy of Family Physicians, Ohio State Medical Association, Ohio State Radiological Society, and Ohio State University College of Medicine and Public Health.

_____